Summary
6/25/2018 1:41:01 PM

Differences exist between documents.

**New Document:**
16-1423_new
71 pages (394 KB)
6/25/2018 1:40:53 PM
Used to display results.

**Old Document:**
16-1423
71 pages (394 KB)
6/25/2018 1:40:53 PM

Get started: first change is on page 43.

No pages were deleted

**How to read this report**

**Highlight** indicates a change.
~~Deleted~~ indicates deleted content.
▲ indicates pages were changed.
⬌ indicates pages were moved.

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## ORTIZ *v.* UNITED STATES

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE ARMED FORCES

No. 16–1423.　Argued January 16, 2018—Decided June 22, 2018

Congress has long provided for specialized military courts to adjudicate charges against service members**.**  Today, courts-martial hear cases involving crimes unconnected with military service.  They are also subject to several tiers of appellate review, and thus are part of an integrated "court-martial system" that resembles civilian structures of justice.  That system begins with the court-martial itself, a tribunal that determines guilt or innocence and levies punishment, up to lifetime imprisonment or execution.  The next phase occurs at one of four appellate courts: the Court of Criminal Appeals (CCA) for the Army, Navy-Marine Corps, Air Force, or Coast Guard.  They review decisions where the sentence is a punitive discharge, incarceration for more than one year, or death.  The Court of Appeals for the Armed Forces (CAAF) sits atop the court-martial system.  The CAAF is a "court of record" composed of five civilian judges, 10 U. S. C. §941, which must review certain weighty cases and may review others.  Finally, 28 U. S. C. §1259 gives this Court jurisdiction to review the CAAF's decisions by writ of certiorari.

　Petitioner Keanu Ortiz, an Airman First Class, was convicted by a court-martial of possessing and distributing child pornography, and he was sentenced to two years' imprisonment and a dishonorable discharge.  An Air Force CCA panel, including Colonel Martin Mitchell, affirmed that decision.  The CAAF then granted Ortiz's petition for review to consider whether Judge Mitchell was disqualified from serving on the CCA because he had been appointed to the Court of Military Commission Review (CMCR).  The Secretary of Defense had initially put Judge Mitchell on the CMCR under his statutory authority to "assign [officers] who are appellate military judges" to serve on that court.  10 U. S. C. §950f(b)(2).  To moot a possible constitutional

problem with the assignment, the President (with the Senate's advice and consent) also appointed Judge Mitchell to the CMCR pursuant to §950f(b)(3). Shortly thereafter, Judge Mitchell participated in Ortiz's CCA appeal.

Ortiz claimed that Judge Mitchell's CMCR appointment barred his continued CCA service under both a statute and the Constitution. First, he argued that the appointment violated §973(b)(2)(A), which provides that unless "otherwise authorized by law," an active-duty military officer "may not hold, or exercise the functions of," certain "civil office[s]" in the federal government. Second, he argued that the Appointments Clause prohibits simultaneous service on the CMCR and the CCA. The CAAF rejected both grounds for ordering another appeal.

*Held*:

1. This Court has jurisdiction to review the CAAF's decisions. The judicial character and constitutional pedigree of the court-martial system enable this Court, in exercising appellate jurisdiction, to review the decisions of the court sitting at its apex.

An *amicus curiae*, Professor Aditya Bamzai, argues that cases decided by the CAAF do not fall within Article III's grant of appellate jurisdiction to this Court. In *Marbury* v. *Madison*, 1 Cranch 137, Chief Justice Marshall explained that "the essential criterion of appellate jurisdiction" is "that it revises and corrects the proceedings in a cause already instituted, and does not create that cause." *Id.,* at 175. Here, Ortiz's petition asks the Court to "revise and correct" the latest decision in a "cause" that began in and progressed through military justice "proceedings." Unless Chief Justice Marshall's test implicitly exempts cases instituted in a military court, the case is now appellate.

There is no reason to make that distinction. The military justice system's essential character is judicial. Military courts decide cases in strict accordance with a body of federal law and afford virtually the same procedural protections to service members as those given in a civilian criminal proceeding. The judgments a military tribunal renders "rest on the same basis, and are surrounded by the same considerations[, as] give conclusiveness to the judgments of other legal tribunals." *Ex parte Reed*, 100 U. S. 13, 23. Accordingly, such judgments have res judicata and Double Jeopardy effect. The jurisdiction and structure of the court-martial system likewise resemble those of other courts whose decisions this Court reviews. Courts-martial try service members for garden-variety crimes unrelated to military service, and can impose terms of imprisonment and capital punishment. Their decisions are also subject to an appellate process similar to the one found in most States. And just as important, the

constitutional foundation of courts-martial is not in the least inse-
cure. See *Dynes* v. *Hoover*, 20 How. 65, 79. The court-martial is older
than the Constitution, was recognized and sanctioned by the Fram-
ers, and has been authorized here since the first Congress. Through-
out that history, courts-martial have operated as instruments of mili-
tary justice, not mere military command. They are bound, like any
court, by the fundamental principles of law and the duty to adjudi-
cate cases without partiality.

   Bamzai argues that the Court lacks jurisdiction because the CAAF
is not an Article III court, but is instead in the Executive Branch.
This Court's appellate jurisdiction, however, covers more than the de-
cisions of Article III courts. This Court can review proceedings of
state courts. See *Martin* v. *Hunter's Lessee*, 1 Wheat. 304. It can also
review certain non-Article III judicial systems created by Congress.
In particular, the Court has upheld its exercise of appellate jurisdic-
tion over decisions of non-Article III territorial courts, see *United
States* v. *Coe*, 155 U. S. 76, and it has uncontroversially exercised ap-
pellate jurisdiction over non-Article III District of Columbia courts,
see *Palmore* v. *United States*, 411 U. S. 389. The non-Article III
court-martial system stands on much the same footing as territorial
and D. C. courts. All three rest on an expansive constitutional dele-
gation, have deep historical roots, and perform an inherently judicial
role. Thus, in *Palmore*, this Court viewed the military, territories,
and District as "specialized areas having particularized needs" in
which Article III "give[s] way to accommodate plenary grants of pow-
er to Congress." *Id.*, at 408.

   Bamzai does not provide a sufficient reason to divorce military
courts from territorial and D. C. courts when it comes to defining this
Court's appellate jurisdiction. He first relies on the fact that territo-
rial and D. C. courts exercise power over discrete geographic areas,
while military courts do not. But this distinction does not matter to
the jurisdictional inquiry. His second argument focuses on the fact
that the CAAF is in the Executive Branch. In his view, two of the
Court's precedents—*Ex parte Vallandigham*, 1 Wall. 243, and *Mar-
bury*, 1 Cranch 137—show that the Court may never accept appellate
jurisdiction from any person or body within that branch. As to *Val-
landigham*, that case goes to show only that not every military tribu-
nal is alike. Unlike the military commission in *Vallandigham*, which
lacked "judicial character," 1 Wall., at 253, the CAAF is a permanent
court of record established by Congress, and its decisions are final
unless the Court reviews and reverses them. As to *Marbury*, James
Madison's failure to transmit William Marbury's commission was not
a judicial decision by a court. Here, by contrast, three constitutional-
ly rooted courts rendered inherently judicial decisions. Pp. 5–19.

2. Judge Mitchell's simultaneous service on the CCA and the CMCR violated neither §973(b)(2)(A) nor the Appointments Clause. Pp. 19–25.

(a) The statutory issue turns on two interlocking provisions. Section 973(b)(2)(A) is the statute that Ortiz claims was violated here. It prohibits military officers from "hold[ing], or exercis[ing] the functions of," certain "civil office[s]" in the federal government, "[e]xcept as otherwise authorized by law." Section 950f(b) is the statute that the Government claims "otherwise authorize[s]" Judge Mitchell's CMCR service, even if a seat on that court is a covered "civil office." It provides two ways to become a CMCR judge. Under §950f(b)(2), the Secretary of Defense "may assign" qualified officers serving on a CCA to be judges on the CMCR. Under §950f(b)(3), the President (with the Senate's advice and consent) "may appoint" persons— whether officers or civilians is unspecified—to CMCR judgeships.

Ortiz argues that Judge Mitchell was not "authorized by law" to serve on the CMCR after his appointment because §950f(b)(3) makes no express reference to military officers. In the circumstances here, however, the express authorization to assign military officers to the CMCR under §950f(b)(2) was the only thing necessary to exempt Judge Mitchell from §973(b)(2)(A). Once the Secretary of Defense placed Judge Mitchell on the CMCR pursuant to §950f(b)(2), the President's later appointment made no difference. It did not negate the Secretary's earlier action, but rather ratified what the Secretary had already done. Thus, after the appointment, Judge Mitchell served on the CMCR by virtue of both the Secretary's assignment and the President's appointment. And because §950f(b)(2) expressly authorized the Secretary's assignment, Judge Mitchell's CMCR service could not run afoul of §973(b)(2)(A)'s general rule. Pp. 20–23.

(b) Ortiz also raises an Appointments Clause challenge to Judge Mitchell's simultaneous service on the CCA and the CMCR. That Clause distinguishes between principal officers and inferior officers. CCA judges are inferior officers. Ortiz views CMCR judges as principal officers. And Ortiz argues that, under the Appointments Clause, a single judge cannot serve as an inferior officer on one court and a principal officer on another. But the Court has never read the Appointments Clause to impose rules about dual service, separate and distinct from methods of appointment. And if the Court were ever to apply the Clause to dual-officeholding, it would not start here. Ortiz does not show how Judge Mitchell's CMCR service would result in "undue influence" on his CCA colleagues. Pp. 23–25.

76 M. J. 125 and 189, affirmed.

KAGAN, J., delivered the opinion of the Court, in which ROBERTS,

Syllabus

C. J., and KENNEDY, THOMAS, GINSBURG, BREYER, and SOTOMAYOR, JJ., joined. THOMAS, J., filed a concurring opinion. ALITO, J., filed a dissenting opinion, in which GORSUCH, J., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 16–1423

KEANU D. W. ORTIZ, PETITIONER *v.* UNITED STATES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE ARMED FORCES

[June 22, 2018]

JUSTICE KAGAN delivered the opinion of the Court.

This case is about the legality of a military officer serving as a judge on both an Air Force appeals court and the Court of Military Commission Review (CMCR). The petitioner, an airman convicted of crimes in the military justice system, contends that the judge's holding of dual offices violated a statute regulating military service, as well as the Constitution's Appointments Clause. The Court of Appeals for the Armed Forces (CAAF) rejected those claims, and we granted a petition for certiorari. We hold first that this Court has jurisdiction to review decisions of the CAAF, even though it is not an Article III court. We then affirm the CAAF's determination that the judge's simultaneous service was lawful.

I

In the exercise of its authority over the armed forces, Congress has long provided for specialized military courts to adjudicate charges against service members. Today, trial-level courts-martial hear cases involving a wide range of offenses, including crimes unconnected with military service; as a result, the jurisdiction of those tribunals overlaps substantially with that of state and federal

courts. See *Solorio* v. *United States*, 483 U. S. 435, 436 (1987); *United States* v. *Kebodeaux*, 570 U. S. 387, 404 (2013) (ALITO, J., concurring in judgment). And courts-martial are now subject to several tiers of appellate review, thus forming part of an integrated "court-martial system" that closely resembles civilian structures of justice. *United States* v. *Denedo*, 556 U. S. 904, 920 (2009); see *Weiss* v. *United States*, 510 U. S. 163, 174 (1994).

That system begins with the court-martial itself, an officer-led tribunal convened to determine guilt or innocence and levy appropriate punishment, up to lifetime imprisonment or execution. See 10 U. S. C. §§816, 818, 856a. The next phase of military justice occurs at one of four appellate courts: the Court of Criminal Appeals (CCA) for the Army, Navy-Marine Corps, Air Force, or Coast Guard. Those courts, using three-judge panels of either officers or civilians, review all decisions in which the sentence imposed involves a punitive discharge, incarceration for more than one year, or death. See §§866(a)–(c). Atop the court-martial system is the CAAF, a "court of record" made up of five civilian judges appointed to serve 15-year terms. §941; see §§942(a)–(b). The CAAF must review certain weighty cases (including those in which capital punishment was imposed), and may grant petitions for review in any others. See §867. Finally, this Court possesses statutory authority to step in afterward: Under 28 U. S. C. §1259, we have jurisdiction to review the CAAF's decisions by writ of certiorari.

Petitioner Keanu Ortiz's case has run the gamut of this legal system. Ortiz, an Airman First Class in the Air Force, was charged with knowingly possessing and distributing child pornography, in violation of the Uniform Code of Military Justice. A court-martial found Ortiz guilty as charged and imposed a sentence of two years' imprisonment and a dishonorable discharge. On appeal, an Air Force CCA panel, including Colonel Martin Mitch-

ell, summarily affirmed the court-martial's decision. The CAAF then granted Ortiz's petition for review to consider whether Judge Mitchell was disqualified from serving on the CCA, thus entitling Ortiz to an appellate do-over.

That issue arose from Judge Mitchell's simultaneous service on the CMCR. Congress created the CMCR as an appellate tribunal to review the decisions of military commissions, particularly those operating in Guantanamo Bay.[1] The Secretary of Defense put Judge Mitchell on that court shortly after he became a member of the CCA, under a statutory provision authorizing the Secretary to "assign [officers] who are appellate military judges" to serve on the CMCR as well. 10 U. S. C. §950f(b)(2). Around the same time, a military-commission defendant argued to the Court of Appeals for the D. C. Circuit that the Appointments Clause requires the President and Senate (rather than the Secretary) to place judges on the CMCR. The D. C. Circuit avoided resolving that issue, but suggested that the President and Senate could "put [it] to rest" by appointing the very CMCR judges whom the Secretary had previously assigned. *In re al-Nashiri*, 791 F. 3d 71, 86 (2015). The President decided to take that advice, and nominated each of those judges—Mitchell, among them— under an adjacent statutory provision authorizing him to "appoint, by and with the advice and consent of the Senate," CMCR judges. §950f(b)(3). The Senate then confirmed those nominations. About a month later, Judge Mitchell—now wearing his CCA robe—participated in the panel decision rejecting Ortiz's appeal.

In Ortiz's view, Judge Mitchell's appointment to the CMCR barred his continued service on the CCA under

---

[1] In contrast to courts-martial, military commissions have historically been used to substitute for civilian courts in times of martial law or temporary military government, as well as to try members of enemy forces for violations of the laws of war. See *Hamdan* v. *Rumsfeld*, 548 U. S. 557, 595–597 (2006) (plurality opinion).

both a statute and the Constitution. First, Ortiz invoked 10 U. S. C. §973(b). That statute, designed to ensure civilian preeminence in government, provides that unless "otherwise authorized by law," an active-duty military officer like Judge Mitchell "may not hold, or exercise the functions of," certain "civil office[s]" in the Federal Government. §973(b)(2)(A). According to Ortiz, a CMCR judgeship is a covered civil office, and no other law allowed the President to put Mitchell in that position: Thus, his appointment to the CMCR violated §973(b). See Brief in Support of Petition Granted in No. 16–0671 (CAAF), pp. 17–22. And the proper remedy, Ortiz argued, was to terminate Judge Mitchell's military service effective the date of his CMCR appointment and void all his later actions as a CCA judge—including his decision on Ortiz's appeal. See *ibid.* Second and independently, Ortiz relied on the Appointments Clause to challenge Judge Mitchell's dual service. See *id.,* at 27–40. The premise of his argument was that CMCR judges are "principal officers" under that Clause, whereas CCA judges (as this Court has held) are "inferior officers." *Edmond* v. *United States*, 520 U. S. 651, 666 (1997). Ortiz claimed that the Appointments Clause prohibits someone serving as a principal officer on one court (the CMCR) from sitting alongside inferior officers on another court (the CCA). Because Judge Mitchell had done just that, Ortiz concluded, the CCA's ruling on his appeal could not stand.

The CAAF rejected both grounds for ordering another appeal. See 76 M. J. 189 (2017). In considering the statutory question, the court chose not to decide whether §973(b) precluded Judge Mitchell from serving on the CMCR while an active-duty officer. Even if so, the CAAF held, the remedy for the violation would not involve terminating the judge's military service or voiding actions he took on the CCA. See *id.,* at 192. Turning next to the constitutional issue, the CAAF "s[aw] no Appointments

Clause problem." *Id.,* at 193. Even assuming Judge Mitchell was a principal officer when sitting on the CMCR, the court held, that status in no way affected his service on the CCA: "When Colonel Mitchell sits as a CCA judge, he is no different from any other CCA judge." *Ibid.* The CAAF thus upheld the CCA's affirmance of Ortiz's convictions.

This Court granted Ortiz's petition for certiorari to consider whether either §973(b) or the Appointments Clause prevents a military officer from serving, as Judge Mitchell did, on both a CCA and the CMCR. 582 U. S. \_\_\_ (2017). We now affirm the decision below.[2]

II

We begin with a question of our own jurisdiction to review the CAAF's decisions. Congress has explicitly authorized us to undertake such review in 28 U. S. C. §1259. See *ibid.* ("Decisions of the [CAAF] may be reviewed by the Supreme Court by writ of certiorari"). Both the Federal Government and Ortiz view that grant of jurisdiction as constitutionally proper. But an *amicus curiae*, Professor Aditya Bamzai, argues that it goes beyond what Article III allows. That position is a new one to this Court: We have previously reviewed nine CAAF decisions without anyone objecting that we lacked the power to do so.[3] Still, we think the argument is serious, and

——————

[2] At the same time we issued a writ of certiorari in this case, we granted and consolidated petitions in two related cases—*Dalmazzi* v. *United States*, No. 16–961, and *Cox* v. *United States*, No. 16–1017. Those cases raise issues of statutory jurisdiction that our disposition today makes it unnecessary to resolve. We accordingly dismiss *Dalmazzi, post,* p. \_\_\_, and *Cox, post,* p. \_\_\_*,* as improvidently granted in opinions accompanying this decision.

[3] See *United States* v. *Denedo*, 556 U. S. 904 (2009); *Clinton* v. *Goldsmith*, 526 U. S. 529 (1999); *United States* v. *Scheffer*, 523 U. S. 303 (1998); *Edmond* v. *United States*, 520 U. S. 651 (1997); *Loving* v. *United States*, 517 U. S. 748 (1996); *Ryder* v. *United States*, 515 U. S. 177

deserving of sustained consideration.  That analysis leads us to conclude that the judicial character and constitutional pedigree of the court-martial system enable this Court, in exercising appellate jurisdiction, to review the decisions of the court sitting at its apex.

Bamzai starts with a proposition no one can contest—that our review of CAAF decisions cannot rest on our *original* jurisdiction.  Brief for Aditya Bamzai as *Amicus Curiae* 11.  Article III of the Constitution grants this Court original jurisdiction in a limited category of cases: those "affecting Ambassadors, other public Ministers and Consuls, and those in which a State shall be Party."  §2, cl. 2.  That list, of course, does not embrace Ortiz's case, or any other that the CAAF considers.  And ever since *Marbury* v. *Madison*, 1 Cranch 137 (1803), this Court has recognized that our original jurisdiction cannot extend any further than the cases enumerated: If Congress attempts to confer more on us, we must (as Chief Justice Marshall famously did, in the pioneer act of judicial review) strike down the law.  *Id.,* at 174–180.  As a result, Bamzai is right to insist that §1259 could not authorize this Court, as part of its original jurisdiction, to hear military cases like Ortiz's.

The real issue is whether our *appellate* jurisdiction can cover such cases.  Article III's sole reference to appellate jurisdiction provides no apparent barrier, but also no substantial guidance: Following its specification of this Court's original jurisdiction, Article III says only that in all "other Cases" that the Constitution comprehends (including cases, like this one, involving federal questions), "the supreme Court shall have appellate Jurisdiction, both as to Law and Fact."  §2, cl. 2.  The Constitution's failure

———————

(1995); *Davis* v. *United States*, 512 U. S. 452 (1994); *Weiss* v. *United States*, 510 U. S. 163 (1994); *Solorio* v. *United States*, 483 U. S. 435 (1987).

to say anything more about appellate jurisdiction leads Bamzai to focus on Chief Justice Marshall's opinion in *Marbury*. See Brief for Bamzai 2–4, 12–14. In that case (as you surely recall), William Marbury petitioned this Court—without first asking any other—to issue a writ of mandamus to Secretary of State James Madison directing him to deliver a commission. After holding (as just related) that the Court's original jurisdiction did not extend so far, Chief Justice Marshall also rejected the idea that the Court could provide the writ in the exercise of its appellate jurisdiction. "[T]he essential criterion of appellate juris-diction," the Chief Justice explained, is "that it revises and corrects the proceedings in a cause already instituted, and does not create that cause." 1 Cranch, at 175. Marbury's petition, Chief Justice Marshall held, commenced the cause—or, to use the more modern word, the case; hence, it was not a matter for appellate jurisdiction. Bamzai contends that the same is true of Ortiz's petition.

On any ordinary understanding of the great Chief Jus-tice's words, that is a surprising claim. Ortiz's petition asks us to "revise and correct" the latest decision in a "cause" that began in and progressed through military justice "proceedings." *Ibid.* Or, as the Government puts the point, this case fits within Chief Justice Marshall's standard because "it comes to th[is] Court on review of the Court of Appeals for the Armed Forces' decision, which reviewed a criminal proceeding that originated in [a] court[]-martial." Tr. of Oral Arg. 47–48. So this Court would hardly be the first to render a decision in the case. Unless Chief Justice Marshall's test implicitly exempts cases instituted in a military court—as contrasted, for example, with an ordinary federal court—the case is now appellate.[4]

————————

[4] The dissent asserts that, in setting out that test, we have "basically proceed[ed] as though *Marbury* were our last word on the subject" and

The military justice system's essential character—in a word, judicial—provides no reason to make that distinction. Accord *post,* at 6–8 (THOMAS, J., concurring). Each level of military court decides criminal "cases" as that term is generally understood, and does so in strict accordance with a body of federal law (of course including the Constitution). The procedural protections afforded to a service member are "virtually the same" as those given in a civilian criminal proceeding, whether state or federal. 1 D. Schlueter, Military Criminal Justice: Practice and Procedure §1–7, p. 50 (9th ed. 2015) (Schlueter). And the judgments a military tribunal renders, as this Court long ago observed, "rest on the same basis, and are surrounded by the same considerations[, as] give conclusiveness to the judgments of other legal tribunals." *Ex parte Reed*, 100 U. S. 13, 23 (1879). Accordingly, we have held that the "valid, final judgments of military courts, like those of any court of competent jurisdiction[,] have res judicata effect and preclude further litigation of the merits." *Schlesinger* v. *Councilman*, 420 U. S. 738, 746 (1975). In particular, those judgments have identical effect under the Double Jeopardy Clause. See *Grafton* v. *United States*, 206 U. S.

––––––––––

overlooked "two centuries of precedent." *Post*, at 8 (opinion of ALITO, J.). But the cases the dissent faults us for failing to cite stand for the same principle that we—and more important, *Marbury*—already set out. They too say that our appellate jurisdiction permits us to review only prior judicial decisions, rendered by courts. See, *e.g.*, *Ex parte Yerger*, 8 Wall. 85, 97 (1869) (Our "appellate jurisdiction" may "be exercised only in the revision of judicial decisions"); *The Alicia*, 7 Wall. 571, 573 (1869) ("[A]n appellate jurisdiction necessarily implies some judicial determination . . . of an inferior tribunal, from which an appeal has been taken"); *Cohens* v. *Virginia*, 6 Wheat. 264, 396 (1821) (In exercising appellate jurisdiction, we act as a "supervising Court, whose peculiar province it is to correct the errors of an inferior Court"); *Ex parte Bollman*, 4 Cranch 75, 101 (1807) (We exercise "appellate jurisdiction" in "revisi[ng] a decision of an inferior court"); *post*, at 4–6, 10, 12. *Marbury*, then, remains the key precedent.

333, 345 (1907).

The jurisdiction and structure of the court-martial system likewise resemble those of other courts whose decisions we review. Although their jurisdiction has waxed and waned over time, courts-martial today can try service members for a vast swath of offenses, including garden-variety crimes unrelated to military service. See 10 U. S. C. §§877–934; *Solorio*, 483 U. S., at 438–441; *supra,* at 1–2. As a result, the jurisdiction of those tribunals overlaps significantly with the criminal jurisdiction of federal and state courts. See *Kebodeaux*, 570 U. S., at 404 (ALITO, J., concurring in judgment). The sentences meted out are also similar: Courts-martial can impose, on top of peculiarly military discipline, terms of imprisonment and capital punishment. See §818(a); *post*, at 6 (THOMAS, J., concurring) ("[T]hese courts decide questions of the most momentous description, affecting even life itself" (quotation marks and ellipses omitted)). And the decisions of those tribunals are subject to an appellate process—what we have called an "integrated system of military courts and review procedures"—that replicates the judicial apparatus found in most States. *Councilman*, 420 U. S., at 758. By the time a case like Ortiz's arrives on our doorstep under 28 U. S. C. §1259, it has passed through not one or two but three military courts (including two that can have civilian judges).

And just as important, the constitutional foundation of courts-martial—as judicial bodies responsible for "the trial and punishment" of service members—is not in the least insecure. *Dynes* v. *Hoover*, 20 How. 65, 79 (1858). The court-martial is in fact "older than the Constitution," 1 Schlueter §1–6(B), at 39; the Federalist Papers discuss "trials by courts-martial" under the Articles of Confederation, see No. 40, p. 250 (C. Rossiter ed. 1961). When it came time to draft a new charter, the Framers "recogni[zed] and sanction[ed] existing military jurisdiction," W.

Winthrop, Military Law and Precedents 48 (2d ed. 1920) (emphasis deleted), by exempting from the Fifth Amendment's Grand Jury Clause all "cases arising in the land or naval forces." And by granting legislative power "[t]o make Rules for the Government and Regulation of the land and naval Forces," the Framers also authorized Congress to carry forward courts-martial. Art. I, §8, cl. 14. Congress did not need to be told twice. The very first Congress continued the court-martial system as it then operated. See Winthrop, *supra,* at 47. And from that day to this one, Congress has maintained courts-martial in all their essentials to resolve criminal charges against service members. See 1 Schlueter §1–6, at 35–48.

Throughout that history, and reflecting the attributes described above, courts-martial have operated as instruments of military justice, not (as the dissent would have it) mere "military command," *post,* at 18 (opinion of ALITO, J.). As one scholar has noted, courts-martial "have long been understood to exercise 'judicial' power," of the same kind wielded by civilian courts. Nelson, Adjudication in the Political Branches, 107 Colum. L. Rev. 559, 576 (2007); see W. De Hart, Observations on Military Law 14 (1859) (Military courts are "imbued or endowed with the like essence of judicial power" as "ordinary courts of civil judicature"); accord *post*, at 6–8 (THOMAS, J., concurring). Attorney General Bates, even in the middle of the Civil War, characterized a court-martial "proceeding, from its inception, [a]s judicial," because the "trial, finding, and sentence are the solemn acts of a court organized and conducted under the authority of and according to the prescribed forms of law." *Runkle* v. *United States*, 122 U. S. 543, 558 (1887) (quoting 11 Op. Atty. Gen. 19, 21 (1864)). Colonel Winthrop—whom we have called the "Blackstone of Military Law," *Reid* v. *Covert*, 354 U. S. 1, 19, n. 38 (1957) (plurality opinion)—agreed with Bates. He regarded a court-martial as "in the strictest sense" a

"court of law and justice"—"bound, like any court, by the fundamental principles of law" and the duty to adjudicate cases "without partiality, favor, or affection." Winthrop, *supra,* at 54.[5]

Despite all this, Bamzai claims that "*Marbury* bars th[is] Court from deciding" any cases coming to us from the court-martial system. Brief for Bamzai 3. He begins, much as we did above, by explaining that under *Marbury* the Court can exercise appellate jurisdiction only when it is "supervising an earlier decision by a lower court." Brief for Bamzai 13. The next step is where the argument gets interesting. The CAAF, Bamzai contends, simply does not qualify as such a body (nor does any other military tribunal). True enough, "the CAAF is called a 'court'"; and true enough, it decides cases, just as other courts do. *Id.,* at 3; see *id.*, at 28. But the CAAF, Bamzai notes, is "not an *Article III* court," *id.*, at 3 (emphasis added): As all agree,

––––––––––

[5] The independent adjudicative nature of courts-martial is not inconsistent with their disciplinary function, as the dissent claims, see *post*, at 18–26. By adjudicating criminal charges against service members, courts-martial of course help to keep troops in line. But the way they do so—in comparison to, say, a commander in the field—is fundamentally judicial. Accord *post*, at 9 (THOMAS, J., concurring) ("While the CAAF is in the Executive Branch and its purpose is to help the President maintain troop discipline, those facts do not change the *nature* of the power that it exercises"). Colonel Winthrop stated as much: Even while courts-martial "enforc[e] discipline" in the armed forces, they remain "as fully a court of law and justice as is any civil tribunal." W. Winthrop, Military Law and Precedents 49, 54 (2d ed. 1920). And he was right. When a military judge convicts a service member and imposes punishment—up to execution—he is not meting out extrajudicial discipline. He is acting *as a judge*, in strict compliance with legal rules and principles—rather than as an "arm of military command." *Post*, at 18. It is in fact one of the glories of this country that the military justice system is so deeply rooted in the rule of law. In asserting the opposite—that military courts are not "judicial" in "character"—the dissent cannot help but do what it says it would like to avoid: "denigrat[e the court-martial] system." *Post*, at 27; see *post*, at 25.

its members lack the tenure and salary protections that are the hallmarks of the Article III judiciary, see 10 U. S. C. §§942(b), (c). Congress established the CAAF under its Article I, rather than its Article III, powers, and Congress located the CAAF (as we have previously observed) within the Executive Branch, rather than the judicial one. See §941; *Edmond*, 520 U. S., at 664, and n. 2. Those facts, in Bamzai's view, prevent this Court from exercising appellate jurisdiction over the CAAF. "For constitutional purposes," Bamzai concludes, the members of the CAAF "stand on equal footing with James Madison in *Marbury*." Brief for Bamzai 4. (With variations here and there, the dissent makes the same basic argument.)

But this Court's appellate jurisdiction, as Justice Story made clear ages ago, covers more than the decisions of Article III courts. In *Martin* v. *Hunter's Lessee*, 1 Wheat. 304 (1816), we considered whether our appellate jurisdiction extends to the proceedings of state courts, in addition to those of the Article III federal judiciary. We said yes, as long as the case involves subject matter suitable for our review. *Id.,* at 338–352. For our "appellate power," Story wrote, "is not limited by the terms of [Article III] to any particular courts." *Id.,* at 338. Or again: "[I]t will be in vain to search in the letter of the [C]onstitution for any qualification as to the tribunal" from which a given case comes. *Ibid.* The decisions we review might come from Article III courts, but they need not.

The same lesson emerges from two contexts yet more closely resembling this one—each involving a non-Article III judicial system created by Congress. First, in *United States* v. *Coe*, 155 U. S. 76 (1894), this Court upheld the exercise of appellate jurisdiction over decisions of federal territorial courts, despite their lack of Article III status. We observed there that the Constitution grants Congress broad authority over the territories: to "make all needful Rules and Regulations respecting" those areas. Art. IV,

§3, cl. 2; see *Coe*, 155 U. S., at 85. And we recognized that Congress, with this Court's permission, had long used that power to create territorial courts that did not comply with Article III. See *ibid.* Chief Justice Marshall had held such a court constitutional in 1828 even though its authority was "not a part of that judicial power which is defined in the 3d article." *American Ins. Co.* v. *356 Bales of Cotton*, 1 Pet. 511, 546 (1828); see *Coe*, 155 U. S., at 85 (describing that opinion as having "settled" that Article III "does not exhaust the power of Congress to establish courts"). The exception to Article III for territorial courts was thus an established and prominent part of the legal landscape by the time *Coe* addressed this Court's role in reviewing their decisions. And so the Court found the issue simple. "There has never been any question," we declared, "that the judicial action of [territorial courts] may, in accordance with the Constitution, be subjected to [our] appellate jurisdiction." *Id.,* at 86.

Second, we have routinely, and uncontroversially, exercised appellate jurisdiction over cases adjudicated in the non-Article III District of Columbia courts.[6] Here too, the Constitution grants Congress an unqualified power: to legislate for the District "in all Cases whatsoever." Art. I, §8, cl. 17. Under that provision, we long ago determined, "Congress has the entire control over the [D]istrict for every purpose of government," including that of "organizing a judicial department." *Kendall* v. *United States ex rel. Stokes*, 12 Pet. 524, 619 (1838). So when Congress in-

––––––––––

[6] See, *e.g.*, *Artis* v. *District of Columbia*, 583 U. S. ___ (2018); *Turner* v. *United States*, 582 U. S. ___ (2017); *United States* v. *Dixon*, 509 U. S. 688 (1993); *Jones* v. *United States*, 463 U. S. 354 (1983); *Tuten* v. *United States*, 460 U. S. 660 (1983); *Whalen* v. *United States*, 445 U. S. 684 (1980); *United States* v. *Crews*, 445 U. S. 463 (1980); *Pernell* v. *Southall Realty*, 416 U. S. 363 (1974); *Palmore* v. *United States*, 411 U. S. 389 (1973). In none of these or similar cases has anyone ever challenged our appellate jurisdiction.

voked that authority to create a set of local courts, this Court upheld the legislation—even though the judges on those courts lacked Article III protections. See *Palmore* v. *United States*, 411 U. S. 389, 407–410 (1973). We relied on the Constitution's "plenary grant[] of power to Congress to legislate with respect to" the national capital. *Id.,* at 408. And several years later, we referred as well to the "historical consensus" supporting congressional latitude over the District's judiciary. *Northern Pipeline Constr. Co.* v. *Marathon Pipe Line Co.*, 458 U. S. 50, 70 (1982) (plurality opinion); see *id.,* at 65, n. 16. To be sure, we have never explicitly held, as we did in the territorial context, that those same considerations support our appellate jurisdiction over cases resolved in the D. C. courts. But some things go unsaid because they are self-evident. And indeed, even Bamzai readily acknowledges that this Court can review decisions of the D. C. Court of Appeals. See Brief for Bamzai 23, 25.

The non-Article III court-martial system stands on much the same footing as territorial and D. C. courts, as we have often noted. The former, just like the latter, rests on an expansive constitutional delegation: As this Court early held, Article I gives Congress the power—"entirely independent" of Article III—"to provide for the trial and punishment of military and naval offences in the manner then and now practiced by civilized nations." *Dynes*, 20 How., at 79; see *supra,* at 9. The former has, if anything, deeper historical roots, stretching from before this nation's beginnings up to the present. See *supra,* at 9. And the former, no less than the others, performs an inherently judicial role, as to substantially similar cases. See *supra,* at 8–11. So it is not surprising that we have lumped the three together. In *Palmore*, the Court viewed the military, territories, and District as a triad of "specialized areas having particularized needs" in which Article III "give[s] way to accommodate plenary grants of power to Congress."

411 U. S., at 408. And in *Northern Pipeline*, the plurality said of all three that "a constitutional grant of power [as] historically understood" has bestowed "exceptional pow-ers" on Congress to create courts outside Article III. 458 U. S., at 66, 70.[7] Given those well-understood connections, we would need a powerful reason to divorce military courts from territorial and D. C. courts when it comes to defining our appellate jurisdiction.

And Bamzai fails to deliver one. His initial attempt relies on a simple fact about territorial and D. C. courts: They exercise power over "discrete geographic areas." Brief for Bamzai 23. Military courts do not; they instead exercise power over discrete individuals—*i.e.*, members of the armed forces. So Bamzai gives us a distinction: places vs. people. What he does not offer is a good reason why that distinction should matter in our jurisdictional in-quiry—why it is one of substance, rather than conven-

_____

[7] In addition, several Justices in separate opinions have made the same linkage. See, *e.g., Wellness Int'l Network, Ltd.* v. *Sharif*, 575 U. S. ___, ___ (2015) (ROBERTS, C. J., dissenting) (slip op., at 3) (noting that "narrow exceptions permit Congress to establish non-Article III courts to exercise general jurisdiction in the territories and the District of Columbia [and] to serve as military tribunals"); *id.,* at ___–___ (THOMAS, J., dissenting) (slip op., at 7–8) (referring to territorial courts and courts-martial as "unique historical exceptions" to Article III); *Stern* v. *Marshall*, 564 U. S. 462, 504–505 (2011) (Scalia, J., concurring) (noting the "firmly established historical practice" of exempting territo-rial courts and courts-martial from Article III's demands).

The dissent must dismiss all this authority, from Justices both functionalist and formalist, to aver that "it is *only* when Congress legislates for the Territories and the District that it may lawfully vest judicial power in tribunals that do not conform to Article III." *Post*, at 16; see *post*, at 14–16. Not so, we have made clear, because (once again) of an exceptional grant of power to Congress, an entrenched historical practice, and (for some more functionalist judges) particular-ized needs. The result is "that Congress has the power [apart from Article III] to provide for the adjudication of disputes among the Armed Forces," just as in the territories and the District. *Wellness,* 575 U. S., at ___ (THOMAS, J., dissenting) (slip op., at 8).

ience. He mentions that the territorial and D. C. courts are "functional equivalents of state courts." *Id.,* at 24; see Tr. of Oral Arg. 33, 35. But for starters, that could be said of courts-martial too. As we have described, they try all the "ordinary criminal offenses" (murder, assault, robbery, drug crimes, etc., etc., etc.) that state courts do. *Kebodeaux*, 570 U. S., at 404 (ALITO, J., concurring in judgment); see *supra,* at 1–2, 9. And more fundamentally, we do not see why geographical *state*-likeness, rather than historical *court*-likeness, should dispose of the issue. As we have shown, the petition here asks us to "revise[] and correct[] the proceedings in a cause already instituted" in a judicial system recognized since the founding as competent to render the most serious decisions. *Marbury*, 1 Cranch, at 175; see *supra,* at 8–11. That should make the case an appeal, whether or not the domain that system covers is precisely analogous to, say, Alabama.

So Bamzai tries another route to cleave off military courts, this time focusing on their location in the Executive Branch. See Brief for Bamzai 26–30. Bamzai actually never says in what branch (if any) he thinks territorial and D. C. courts reside. But he knows—because this Court has said—that the CAAF is an "Executive Branch entity." *Edmond*, 520 U. S., at 664, and n. 2; see *supra,* at 12. And in Bamzai's view, two of our precedents show that we may never accept appellate jurisdiction from any person or body within that branch. See Brief for Bamzai 2–4. The first case he cites is *Ex parte Vallandigham*, 1 Wall. 243 (1864), in which the Court held that it lacked jurisdiction over decisions of a temporary Civil War-era military commission. See *id.*, at 251–252. The second is *Marbury* itself, in which the Court held (as if this needed repeating) that it lacked jurisdiction to review James Madison's refusal to deliver a commission appointing William Marbury a justice of the peace. See 1 Cranch, at 175–176; *supra,* at 7.

As to the first, *Vallandigham* goes to show only that not every military tribunal is alike. The commission the Court considered there was established by General Ambrose Burnside (he of the notorious facial hair) for a time-limited, specialized purpose—to try persons within the military Department of Ohio (Burnside's then-command) for aiding the Confederacy. See 1 Wall., at 243–244. And the General kept firm control of the commission (made up entirely of his own field officers): After personally ordering Vallandigham's arrest, he (and he alone) also reviewed the commission's findings and sentence. See *id.,* at 247–248; J. McPherson, Battle Cry of Freedom 596–597 (1988). This Court therefore found that the commission lacked "judicial character." 1 Wall., at 253. It was more an adjunct to a general than a real court—and so we did not have appellate jurisdiction over its decisions.[8] But the

——————

[8] The dissent offers a different—and doubly misleading—explanation for *Vallandigham*. First, it says that we found jurisdiction lacking because the commission was "was not one of the 'courts of the United States' established under Article III." *Post*, at 11 (quoting *Vallandigham*, 1 Wall., at 251). But the dissent is reading from the wrong part of the opinion. *Vallandigham* contained two holdings—first (and relevant here), that Article III precluded the Court from exercising appellate jurisdiction over the commission's decisions, and second (and irrelevant here), that the Judiciary Act of 1789 had not authorized such jurisdiction. The language the dissent quotes relates only to the irrelevant statutory holding: The Judiciary Act, the Court explained, confined our jurisdiction to decisions of Article III courts, and the commission did not fit under that rubric. By contrast, the language we quote in the text formed the basis of the Court's constitutional holding—which is all that matters here. Second, the dissent contends that *Vallandigham* "*recognized* that the military tribunal had 'judicial character,'" even as it found jurisdiction lacking. *Post*, at 11. Not so. *Vallandigham* expressly *rejected* the argument that the commission had "judicial character." 1 Wall., at 253. Though the Court understood that the commission pronounced guilt and imposed sentences, it did not think the commission was acting as a court in rendering its decisions. See *ibid.* (citing *United States* v. *Ferreira*, 13 How. 40, 46–47 (1852), in which the Court held that a claims tribunal was without judicial

very thing that Burnside's commission lacked, the court-martial system—and, in particular, the CAAF (whose decision Ortiz asks us to review)—possesses in spades. Once again, the CAAF is a permanent "court of record" created by Congress; it stands at the acme of a firmly entrenched judicial system that exercises broad jurisdiction in accordance with established rules and procedures; and its own decisions are final (except if we review and reverse them). See *supra,* at 1–2, 8–11.[9]  That is "judicial character" more than sufficient to separate the CAAF from Burnside's commission, and align it instead with territorial and D. C. (and also state and federal) courts of appeals.

And the differences between the CAAF's decisions and James Madison's delivery refusal should have already leaped off the page. To state the obvious: James Madison was not a court, either in name or in function. He was the Secretary of State—the head of a cabinet department (and, by the way, the right arm of the President). Likewise, Madison's failure to transmit Marbury's commission was not a judicial decision; it was an enforcement action (though in the form of non-action), pertaining only to the

———————

"character" and labeled its decisions the "award[s] of a commissioner," "not the judgment[s] of a court of justice").

[9] The dissent contends that the CAAF's decisions are not always final because the President, relevant branch secretary, or one of his subordinates must approve a sentence of death or dismissal from the armed forces before it goes into effect. See *post*, at 28–29. But as the Government has explained, the President's (or other executive official's) authority at that stage extends only to punishment: It is "akin to relief by commutation in the federal or state system." Tr. of Oral Arg. 57; see *Loving* v. *United States*, 62 M. J. 235, 247 (CAAF 2005) (likening the approval authority to "executive clemency powers"). The President, even when "mitigat[ing a] sentence[,]" cannot "upset[ ] the conviction" or "the judgment of the CAAF." Tr. of Oral Arg. 55–56. Rather, as we said above, the CAAF's judgment is final when issued (except if we reverse it). See 10 U. S. C. §871(c)(1) (stating that even when a sentence is subject to an executive official's approval, the "judgment" is "final" when judicial review is concluded).

execution of law. As Chief Justice Marshall saw, Secretary Madison merely triggered the case of *Marbury* v. *Madison*; he did not hear and resolve it, as a judicial body would have done. See 1 Cranch, at 175. The Chief Justice's opinion thus cleanly divides that case from this one, even if both (as Bamzai notes) formally involve executive officers. Here, three constitutionally rooted courts, ending with the CAAF, rendered inherently judicial decisions— just as such tribunals have done since our nation's founding. In reviewing, "revis[ing,] and correct[ing]" those proceedings, as Ortiz asks, we do nothing more or different than in generally exercising our appellate jurisdiction. *Ibid.*

But finally, in holding that much, we say nothing about whether we could exercise appellate jurisdiction over cases from other adjudicative bodies in the Executive Branch, including those in administrative agencies. Our resolution of the jurisdictional issue here has rested on the judicial character, as well as the constitutional foundations and history, of the court-martial system. We have relied, too, on the connections that our cases have long drawn between that judicial system and those of the territories and the District. If Congress were to grant us appellate jurisdiction over decisions of newer entities advancing an administrative (rather than judicial) mission, the question would be different—and the answer not found in this opinion.

### III

We may now turn to the issues we took this case to decide. Recall that Ortiz seeks a new appeal proceeding before the Air Force CCA, based on Judge Mitchell's participation in his last one. See *supra,* at 2–4. Ortiz's challenge turns on Judge Mitchell's simultaneous service on another court, the CMCR. Originally, the Secretary of Defense had assigned Judge Mitchell to sit on that court.

Then, to moot a possible constitutional problem with Judge Mitchell's CMCR service, the President (with the Senate's advice and consent) appointed Judge Mitchell as well. A short time later, Judge Mitchell ruled on Ortiz's CCA appeal. Ortiz contends that doing so violated both a federal statute and the Appointments Clause. We disagree on both counts.

A

The statutory issue respecting Judge Mitchell's dual service turns on two interlocking provisions. The first is §973(b)(2)(A)—the statute Ortiz claims was violated here. As noted earlier, that law—in the interest of ensuring civilian preeminence in government—prohibits active-duty military officers like Judge Mitchell from "hold[ing], or exercis[ing] the functions of," certain "civil office[s]" in the Federal Government, "[e]xcept as otherwise authorized by law." See *supra,* at 4. The second is §950f(b)—a statute the Government claims "otherwise authorize[s]" Judge Mitchell's service on the CMCR, even if a seat on that court is a covered "civil office." As also noted above, §950f(b) provides two ways to become a CMCR judge. See *supra*, at 3. Under §950f(b)(2), the Secretary of Defense "may assign" qualified officers serving on a CCA to "be judges on the [CMCR]" as well. And under §950f(b)(3), the President (with the Senate's advice and consent) "may appoint" persons—whether officers or civilians is unspecified—to CMCR judgeships.

Against that statutory backdrop, Ortiz claims that Judge Mitchell became disqualified from serving on the CCA the moment his presidential appointment to the CMCR became final. See Brief for Petitioners 39–42. Notably, Ortiz has no statutory objection to Judge Mitchell's simultaneous service on those courts before that date—when he sat on the CMCR solely by virtue of the Secretary of Defense's assignment. See *id.,* at 40. Nor

could he reasonably lodge such a complaint, for §950f(b)(2), in no uncertain terms, "otherwise authorize[s]" the Secretary to place a military judge on the CMCR— thus exempting such an officer from §973(b)(2)(A)'s prohibition. But in Ortiz's view, the provision in §950f(b)(3) for presidential appointments contains no similar authorization, because it makes no "express[] or unambiguous[]" reference to military officers. *Id.*, at 20. And so, Ortiz concludes, §973(b)(2)(A)'s general rule must govern.

In the circumstances here, however, the authorization in §950f(b)(2) was the only thing necessary to exempt Judge Mitchell from the civil office-holding ban—not just before but also after his presidential appointment. That provision, as just noted, unambiguously permitted the Secretary of Defense to place Judge Mitchell on the CMCR, even if such a judgeship is a "civil office." See *supra,* at 20. And once that happened, the President's later appointment of Judge Mitchell made not a whit of difference. Nothing in §950f (or any other law) suggests that the President's appointment erased or otherwise negated the Secretary's earlier action. To the contrary, that appointment (made for purposes of protecting against a constitutional challenge, see *supra,* at 3) merely ratified what the Secretary had already done. The nomination papers that the President submitted to the Senate reflect that fact. They sought confirmation of Judge Mitchell's appointment as a CMCR judge "[i]n accordance with [his] continued status as [a CMCR] judge pursuant to [his] assignment by the Secretary of Defense[,] under 10 U. S. C. Section 950f(b)(2)." 162 Cong. Rec. S1474 (Mar. 14, 2016). So after the Senate approved the nomination, Judge Mitchell served on the CMCR by virtue of *both* the Secretary's assignment and the President's appointment. And because §950f(b)(2) expressly authorized the Secretary's assignment, Judge Mitchell's service on the CMCR could

not run afoul of §973(b)(2)(A)'s general rule.[10]

Ortiz argues in response that the President's appointment demanded its own clear authorization because only that appointment put Judge Mitchell into a "new office." Reply Brief 7. According to Ortiz, an officer who receives a secretarial assignment to the CMCR "exercise[s] additional duties"—but he does not hold a second position. Tr. of Oral Arg. 13. A presidential appointment alone, he says, effects that more dramatic change. And Ortiz contends that §973(b)(2)(A)'s rule cares about that difference. That law, Ortiz says, requires a legislative authorization when, and only when, a service member receives a whole new office—which is to say here when, and only when, the President appoints a judge to the CMCR. See Tr. of Oral Arg. 4–5 (stating that §973(b)(2)(A) "prohibit[s] military officers from holding [civil offices] absent express congressional authorization, while generally allowing military officers to be assigned to exercise the duties of such positions").

But that argument is contrary to §973(b)(2)(A)'s text, as well as to the purposes it reflects. The statute draws no distinction between secretarial assignees and presidential appointees, nor between those who exercise the duties of an office and those who formally hold it. True enough, we have sometimes referred to §973(b)(2)(A) as a rule about

———————

[10] We state no opinion on a broader argument the Government makes—that §950f(b)(2) would exempt Judge Mitchell from §973(b)(2)(A)'s office-holding ban even if the Secretary had not assigned him to the CMCR before the President's appointment. See Brief for United States 27–29. And because we hold that the Secretary's assignment authorized Judge Mitchell to serve on the CMCR while an active-duty military officer, we need not decide whether a CMCR judgeship is a covered "civil office" subject to §973(b)(2)(A). Neither need we address the remedial issue on which the CAAF ruled, see *supra,* at 4—*i.e.,* whether a violation of §973(b)(2)(A) would have immediately terminated Judge Mitchell's military service and voided later decisions he made (including in Ortiz's case) as a military judge.

dual "office-holding," see *supra,* at 21, 22, n. 10—but that is mere shorthand. In fact, §973(b)(2)(A)'s prohibition applies broadly, and uniformly, to any military officer who "hold[s], or exercise[s] the functions of," a covered civil office. And the "except as otherwise authorized" caveat applies in the same way—to "hold[ing]" and "exercis[ing]" alike. So the very distinction that Ortiz relies on, the statute rejects: Indeed, the law could not be clearer in its indifference. That is because Congress determined that military officers threaten civilian preeminence in government by *either* "hold[ing]" *or* "exercis[ing] the functions of" important civil offices. Except . . . if Congress decides otherwise and says as much.

And once again, here Congress did exactly that. Judge Mitchell became a CMCR judge, while remaining in the military, because of a secretarial assignment that Congress explicitly authorized. See *supra,* at 20–21. After his presidential appointment, he continued on the same court, doing the same work, in keeping with the same congressional approval. Even supposing he obtained a "new office" in the way Ortiz says, that acquisition is of no moment. With or without that formal office, Judge Mitchell "h[e]ld, or exercise[d] the functions of," a CMCR judgeship, and so was subject to §973(b)(2)(A)'s ban. But likewise, with or without that formal office, Judge Mitchell could receive permission from Congress to do the job—that is, to sit as a judge on the CMCR. And §950f(b)(2) gave Judge Mitchell that legislative green light, from the date of his assignment through his ruling on Ortiz's case and beyond.

## B

Finally, Ortiz raises an Appointments Clause challenge to Judge Mitchell's simultaneous service on the CCA and the CMCR. That Clause provides that the President "shall nominate, and by and with the Advice and Consent

of the Senate, shall appoint" the "Officers of the United States," but that "Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments." Art. II, §2, cl. 2. Litigants usually invoke the Appointments Clause when they object to how a government official is placed in his office. A litigant may assert, for example, that because someone is a principal rather than an inferior officer, he must be nominated by the President and confirmed by the Senate. (Recall that just such an argument about CMCR judges led to Judge Mitchell's presidential appointment. See *supra,* at 3.) But Ortiz's argument is not of that genre. He does not claim that the process used to make Judge Mitchell either a CCA judge or a CMCR judge violated the Appointments Clause. Instead, he claims to find in that Clause a principle relating to dual service. A CCA judge, Ortiz notes, is an inferior officer. See *Edmond*, 520 U. S., at 666. But a CMCR judge, he says (though the Government has argued otherwise), is a principal officer. And in Ortiz's view, a single judge cannot, consistent with the Appointments Clause, serve as an inferior officer on one court and a principal officer on another. He calls such dual office-holding "incongru[ous]" and "functionally incompatible." Brief for Petitioners 50. The problem, he suggests, is that the other (inferior officer) judges on the CCA will be "unduly influenced by" Judge Mitchell's principal-officer status on the CMCR. *Id.,* at 51.

But that argument stretches too far. This Court has never read the Appointments Clause to impose rules about dual service, separate and distinct from methods of appointment. Nor has it ever recognized principles of "incongruity" or "incompatibility" to test the permissibility of holding two offices. As Ortiz himself acknowledges, he can "cite no authority holding that the Appointments Clause prohibits this sort of simultaneous service." *Id.*, at 52.

And if we were ever to apply the Clause to dual office-holding, we would not start here. Ortiz tells no plausible story about how Judge Mitchell's service on the CMCR would result in "undue influence" on his CCA colleagues. The CMCR does not review the CCA's decisions (or vice versa); indeed, the two courts do not have any overlapping jurisdiction. They are parts of separate judicial systems, adjudicating different kinds of charges against different kinds of defendants. See *supra,* at 1–3, and n. 1. We cannot imagine that anyone on the CCA acceded to Judge Mitchell's views because he also sat on the CMCR—any more than we can imagine a judge on an Article III Court of Appeals yielding to a colleague because she did double duty on the Foreign Intelligence Surveillance Court of Review (another specialized court). The CAAF put the point well: "When Colonel Mitchell sits as a CCA judge, he is no different from any other CCA judge." 76 M. J., at 193; see *supra,* at 5. So there is no violation of the Appointments Clause.

IV

This Court has appellate jurisdiction to review the CAAF's decisions. In exercising that jurisdiction, we hold that Judge Mitchell's simultaneous service on the CCA and the CMCR violated neither §973(b)(2)(A)'s office-holding ban nor the Constitution's Appointments Clause. We therefore affirm the judgment below.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

_____

No. 16–1423

_____

## KEANU D. W. ORTIZ, PETITIONER *v.* UNITED STATES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE ARMED FORCES

[June 22, 2018]

JUSTICE THOMAS, concurring.

I join the Court's opinion in full, which persuasively explains why petitioner's statutory and constitutional arguments lack merit. I also agree that the statute giving this Court appellate jurisdiction to review the decisions of the Court of Appeals for the Armed Forces (CAAF), 28 U. S. C. §1259, complies with Article III of the Constitution. I write separately to explain why that conclusion is consistent with the Founders' understanding of judicial power—specifically, the distinction they drew between public and private rights.[1]

I

Article III vests "[t]he judicial Power of the United States" in this Court and any inferior courts that Congress chooses to establish. §1. The judicial power includes the power to resolve the specific types of "Cases" and "Controversies" listed in §2. Article III divides this Court's jurisdiction over those cases into two categories: "original Jurisdiction" and "appellate Jurisdiction." This Court has original jurisdiction in cases affecting ambassadors, other public ministers, and consuls, and cases in which a State is a party. This Court has appellate jurisdiction "[i]n all

_____

[1] I express no view on any other arguments that were not raised by the parties or *amicus* in this case, including any arguments based on Article II of the Constitution.

the other Cases before mentioned" in §2. Because all agree that the CAAF decides "other Cases" that are not reserved for this Court's original jurisdiction, we can review its decisions only under our appellate jurisdiction.

The text of Article III imposes two important limits on this Court's appellate jurisdiction. First, as mentioned, this Court can review only the "other Cases" that are "before mentioned"—*i.e.,* the subject matters of cases listed in §2 that are not reserved for its original jurisdiction. Second, this Court's "appellate Jurisdiction" cannot be "original." As Chief Justice Marshall explained, "the essential criterion of appellate jurisdiction" is that "it revises and corrects the proceedings in a cause already instituted, and does not create that cause." *Marbury* v. *Madison*, 1 Cranch 137, 175 (1803). Thus, this Court cannot exercise appellate jurisdiction unless it is reviewing an already completed exercise of "judicial power." *In re Sanborn*, 148 U. S. 222, 224 (1893); see also *The Alicia*, 7 Wall. 571, 573 (1869) ("An appellate jurisdiction necessarily implies some judicial determination, some judgment, decree, or order of an inferior tribunal, from which an appeal has been taken"); 3 J. Story, Commentaries on the Constitution of the United States §1755, p. 627 (1833) (explaining that this Court can review only decisions "by one clothed with judicial authority, and acting in a judicial capacity").

Other than these two limits, the text of Article III imposes no other self-executing constraints on this Court's appellate jurisdiction. Most notably, it does not require appeals to come from any specific type of tribunal, such as an Article III court. As Justice Story explained, "The appellate power is not limited by the terms of the third article to any particular courts. . . . It is the *case*, then, and not *the court*, that gives the jurisdiction. If the judicial power extends to the case, it will be in vain to search in the letter of the constitution for any qualification as to the

tribunal." *Martin* v. *Hunter's Lessee*, 1 Wheat. 304, 338 (1816). Hamilton made the same point years earlier: "The Constitution in direct terms gives an appellate jurisdiction to the Supreme Court in all the enumerated cases . . . , without a single expression to confine its operation to the inferior federal courts. The objects of appeal, not the tribunals from which it is to be made, are alone contemplated." The Federalist No. 82, pp. 493–494 (C. Rossiter ed. 1961); see also *id.,* No. 81, at 489 (A. Hamilton) (rejecting a "technical interpretation" of the word "appellate" and defining it to mean "nothing more than the power of one tribunal to review the proceedings of another"). This Court has relied on the lack of tribunal-specific limits in Article III to exercise appellate jurisdiction over several types of non-Article III courts, including state courts, see *Martin*, *supra*, at 338, and territorial courts, see *United States* v. *Coe*, 155 U. S. 76, 85–86 (1894); *Wellness Int'l Network, Ltd.* v. *Sharif*, 575 U. S. \_\_\_–\_\_\_, n. 2 (2015) (THOMAS, J., dissenting) (slip op., at 7–8, n. 2) (discussing *American Ins. Co.* v. *356 Bales of Cotton*, 1 Pet. 511, 546 (1828)). In short, this Court's appellate jurisdiction requires the exercise of *a* judicial power, not necessarily "[t]*he* judicial Power of the United States" that Article III vests exclusively in the federal courts, §1 (emphasis added).

The Founders' understanding of judicial power was heavily influenced by the well-known distinction between public and private rights. See *Spokeo, Inc.* v. *Robins*, 578 U. S. \_\_\_, \_\_\_–\_\_\_ (2016) (THOMAS, J., concurring) (slip op., at 1–2); *Wellness, supra*, at \_\_\_–\_\_\_ (opinion of THOMAS, J.) (slip op., at 6–11); Nelson, Adjudication in the Political Branches, 107 Colum. L. Rev. 559, 565 (2007) (Nelson). Public rights "'belon[g] to the people at large,'" while private rights belong to "'each individual.'" *Wellness*, 575 U. S., at \_\_\_ (opinion of THOMAS, J.) (slip op., at 9). The three classic private rights—life, liberty, and

property—are "'unalienable'" and "'absolute,'" as they are "not dependent upon the will of the government." *Ibid.* The Founders linked the disposition of private rights with the exercise of judicial power. See *id.,* at ___ (slip op., at 10). They considered "the power to act conclusively against [private] rights [as] the core of the judicial power." *Ibid.*

A disposition of private rights did not amount to an exercise of judicial power, however, unless it also satisfied "some basic procedural requirements." Nelson 574. Stated differently, the disposition had to "assume such a form that the judicial power is capable of acting on it." *Osborn* v. *Bank of United States*, 9 Wheat. 738, 819 (1824). "[T]hat form generally required the presence (actual or constructive) of adverse parties who had been given some opportunity to be heard before the court rendered a final judgment that bound them." Nelson 574. Once a dispute took this form, judicial power is exercised by "'determin[ing] all differences according to the established law.'" *Wellness*, *supra*, at ___ (opinion of THOMAS, J.) (slip op., at 6) (quoting J. Locke, Second Treatise of Civil Government §125, p. 63 (J. Gough ed. 1947)).

## II

### A

So understood, the CAAF exercises a judicial power. As I explained in *Wellness*, military courts adjudicate core private rights to life, liberty, and property. See 575 U. S., at ___–___ (dissenting opinion) (slip op., at 6–7). That these courts adjudicate core private rights does not contradict the Vesting Clause of Article III, which permits only federal courts to exercise "the judicial Power of the United States." Like other provisions of the Constitution, this language must be read against "commonly accepted background understandings and interpretative principles in place when the Constitution was written," including the

principle that general constitutional rules could apply
"differently to civil than to military entities." Mascott,
Who Are "Officers of the United States"? 70 Stan. L. Rev.
443, 480–483 (2018) (citing Nelson 576); see also *Northern
Pipeline Constr. Co.* v. *Marathon Pipe Line Co.*, 458 U. S.
50, 64 (1982) (plurality opinion) (explaining that inter-
preting Article III to exclude military courts "simply
acknowledge[s] that the literal command of Art. III . . .
must be interpreted in light of . . . historical context . . .
and of the structural imperatives of the Constitution as a
whole"). Based on the "constellation of constitutional
provisions that [indicate] Congress has the power to pro-
vide for the adjudication of disputes among the Armed
Forces it creates," our precedents have long construed the
Vesting Clause of Article III to extend "only to *civilian*
judicial power." *Wellness*, 575 U. S., at \_\_\_ (opinion of
THOMAS, J.) (slip op., at 8) (citing *Dynes* v. *Hoover*, 20
How. 65, 78–79 (1858)). In other words, the powers that
the Constitution gives Congress over the military are "so
exceptional" that they are thought to include the power to
create courts that can exercise a judicial power outside the
confines of Article III. *Northern Pipeline, supra,* at 64.
Thus, military courts are better thought of as an "excep-
tion" or "carve-out" from the Vesting Clause of Article III,
rather than an entity that does not implicate the Vesting
Clause because it does not exercise judicial power in the
first place. See *Wellness, supra*, at \_\_\_–\_\_\_ (opinion of
THOMAS, J.) (slip op., at 6–8).

No party in this case challenges the legitimacy of the
historical exception for military courts. And for good
reason: "At the time of the Framing, . . . it was already
common for nations to organize military tribunals that
stood apart from the ordinary civilian courts, and the
United States itself had done so." Nelson 576. As the
Court explains, military courts predate the Constitution,
were well-known to the Founders, were authorized by the

First Congress, and are expressly contemplated by the
Fifth Amendment. *Ante,* at 9. The crucial point for pre-
sent purposes, however, is that military courts are consid-
ered exempt from the structural requirements of Article
III "because of other provisions of the Constitution, not
because of the definition of judicial power." *Wellness*, 575
U. S., at ___ (opinion of THOMAS, J.) (slip op., at 8) (citing
Nelson 576). They plainly fall within that definition.

Military courts "have long been understood to exercise
'judicial' power" because they "act upon core private rights
to person and property." *Id.,* at 576. "[C]lothed with
judicial powers," these courts decide "questions of the most
momentous description, affecting . . . even life itself." W.
De Hart, Observations on Military Law 14 (1859); see also
11 Op. Atty. Gen. 19, 21 (1864) (explaining that military
courts are "judicial" because they "pass upon the most
sacred questions of human rights . . . which, in the very
nature of things, . . . must be adjudged *according to law*").
Here, for example, the CAAF adjudicated the legality of
petitioner's child-pornography convictions and his sen-
tence of two years confinement—a classic deprivation of
liberty, see *Obergefell* v. *Hodges*, 576 U. S. ___, ___–___
(2015) (THOMAS, J., dissenting) (slip op., at 4–6). "The
passing of judgment on the life and liberty of those con-
victed by the government in a military trial surely falls
within the judicial power." Willis, The Constitution, the
United States Court of Military Appeals and the Future,
57 Mil. L. Rev. 27, 84 (1972). This Court has acknowl-
edged that military courts adjudicate core private rights,
as it has repeatedly held that the prosecution of *non-*
servicemembers in these courts would violate Article III.
See *Northern Pipeline, supra,* at 66, n. 17 (plurality opin-
ion); *e.g., United States ex rel. Toth* v. *Quarles*, 350 U. S.
11 (1955) (former servicemembers); *Reid* v. *Covert*, 354

U. S. 1 (1957) (spouses of servicemembers).[2]

In addition to adjudicating private rights, the CAAF's cases "assume such a form that the judicial power is capable of acting on [them]." *Osborn*, 9 Wheat., at 819. The CAAF adjudicates cases involving "adverse parties who ha[ve] been given some opportunity to be heard." Nelson 574. It has independent authority to "prescribe" its own "rules of procedure," 10 U. S. C. §944, which provide for briefing, oral argument, and other procedures that mirror a federal court of appeals. See generally CAAF Rules of Practice and Proc. (2017). The CAAF also decides cases "'according to the established law.'" *Wellness*, 575 U. S., at ___ (opinion of THOMAS, J.) (slip op., at 6). It can act "only with respect to matters of law," §867(c), and its civilian judges decide cases by independently interpreting the Constitution, the Uniform Code of Military Justice, and other federal laws. Lastly, the CAAF renders "final judgment[s] that b[ind] [the parties]." Nelson 574. Its judgments are "final and conclusive" as soon as they are published and are "binding upon all departments, courts, agencies, and officers of the United States." §876. The Executive Branch has no statutory authority to review or modify the CAAF's decisions.[3] In short, when it comes to

―――――――

[2] Servicemembers consent to military jurisdiction when they enlist. While this consent might allow military courts to adjudicate a servicemember's private rights, it does not transform the nature of the power that the military courts exercise, or somehow transform the servicemember's private right to life, liberty, or property into a public right. See *Wellness Int'l Network, Ltd.* v. *Sharif*, 575 U. S. ___, ___, ___ (2015) (THOMAS, J., dissenting) (slip op., at 6, 14).

[3] Unlike the CAAF's decisions, court-martial proceedings are not final until they are approved by the convening authority. See 10 U. S. C. §876. But the CAAF does not review court-martial proceedings until *after* they have been approved and have been reviewed by an intermediate Court of Criminal Appeals. See §867(c). Because "the [CAAF] reviews court-martial convictions after executive branch review ends," the "[r]eview of its decisions in the Supreme Court of the United States,

the CAAF, "'[t]he whole proceeding from its inception is judicial.'" *Runkle* v. *United States*, 122 U. S. 543, 558 (1887) (quoting 11 Op. Atty. Gen., at 21).[4]

## B

Professor Bamzai contends that the CAAF exercises an executive, not a judicial, power. He notes that this Court has described the CAAF as an "Executive Branch entity," *Edmond* v. *United States*, 520 U. S. 651, 664 (1997), and he cites commentators who describe military courts as "instrumentalities of the executive power" because they help the President maintain discipline over the Armed Forces, W. Winthrop, Military Law and Precedents 49 (2d ed. 1920); G. Davis, Military Law of the United States 15 (2d ed. 1909). Professor Bamzai also compares the CAAF to administrative agencies, which he contends exercise executive power. If agencies exercised core judicial power, he notes, they would be acting unconstitutionally because

———————

by certiorari, . . . poses no finality problems" under Article III. Pfander, Article I Tribunals, Article III Courts, and the Judicial Power of the United States, 118 Harv. L. Rev. 643, 717, n. 327 (2004).

[4] Most of the statutes cited above are unique to the CAAF—the court whose decision we are reviewing and, thus, the only one that matters for purposes of our appellate jurisdiction. I express no view on whether this Court could directly review the CAAF, absent these statutes. And I express no view on whether this Court could directly review the decisions of other military courts, such as courts-martial or military commissions. Cf. *id.,* at 723, n. 358 (suggesting that this Court could not directly review courts-martial and military commissions because their proceedings are "summary" and "create no record to support writ of error review"); Choper & Yoo, Wartime Process: A Dialogue on Congressional Power to Remove Issues from the Federal Courts, 95 Cal. L. Rev. 1243, 1283 (2007) (suggesting that the adjudication of the rights of enemy aliens by law-of-war military commissions might be better understood as exercising the President's power to conduct war, not judicial power). And, of course, this Court's appellate jurisdiction does not allow it to directly review decisions of the Executive Branch that do not "assume such a form that the judicial power is capable of acting on [them]." *Osborn* v. *Bank of United States*, 9 Wheat. 738, 819 (1824).

they do not enjoy the structural protections of Article III. See *Arlington* v. *FCC*, 569 U. S. 290, 304, n. 4 (2013).

These arguments miss the mark. While the CAAF is in the Executive Branch and its purpose is to help the President maintain troop discipline, those facts do not change the *nature* of the power that it exercises. See Brigadier General S. T. Ansell's Brief Filed in Support of His Office Opinion (Dec. 11, 1917), reprinted in Hearings on S. 64 before the Subcommittee of the Senate Committee on Military Affairs, 66th Cong., 1st Sess., 71, 76 (1919). And it is the nature of the power, not the branch exercising it, that controls our appellate jurisdiction:

> "The controlling question is whether the function to be exercised . . . is a judicial function . . . . We must not 'be misled by a name, but look to the substance and intent of the proceeding.' *United States* v. *Ritchie*, 17 How. 525, 534 [(1855)]. 'It is not important . . . whether such a proceeding was originally begun by an administrative or executive determination, if when it comes to the court, whether legislative or constitutional, it calls for the exercise of only the judicial power.'" *Federal Radio Comm'n* v. *Nelson Brothers Bond & Mortgage Co. (Station WIBO)*, 289 U. S. 266, 277–278 (1933) (some citations omitted).

As explained, the CAAF exercises a judicial power because it adjudicates private rights. That the Constitution permits this Executive Branch entity to exercise a particular judicial power—due to the political branches' expansive constitutional powers over the military—does not change the analysis.

Professor Bamzai's analogy to administrative agencies is flawed. Professor Bamzai assumes that, when administrative agencies adjudicate private rights, they are not exercising judicial power. But they are. See *B&B Hardware, Inc.* v. *Hargis Industries, Inc.*, 575 U. S. \_\_\_, \_\_\_–\_\_\_

(2015) (THOMAS, J., dissenting) (slip op., at 11–12). In
fact, they are unconstitutionally exercising "[t]he judicial
Power of the United States," as agencies are not Article III
courts and do not "enjoy a unique, textually based" carve-
out from the Vesting Clause of Article III. *Wellness*, 575
U. S., at ___ (opinion of THOMAS, J.) (slip op., at 14). The
CAAF does enjoy such a carveout, as I explained in *Well-
ness*. But both it and administrative agencies exercise a
judicial power when they adjudicate private rights. Con-
trary to the premise underlying Professor Bamzai's argu-
ment, questions implicating the separation of powers
cannot be answered by arguing, in circular fashion, that
whatever the Executive Branch does is necessarily an
exercise of executive power.

*      *      *

Because the CAAF exercises a judicial power, the stat-
ute giving this Court appellate jurisdiction over its deci-
sions does not violate Article III. For these reasons, and
the reasons given by the Court, I concur.

1

# SUPREME COURT OF THE UNITED STATES

————

No. 16–1423

————

## KEANU D. W. ORTIZ, PETITIONER *v.* UNITED STATES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE ARMED FORCES

[June 22, 2018]

JUSTICE ALITO, with whom JUSTICE GORSUCH joins, dissenting.

I begin with a story that is familiar to students of constitutional law. After his Federalist Party was defeated in the pivotal election of 1800, outgoing President John Adams attempted to fill the Federal Judiciary with individuals favored by his party. The Senate confirmed Adams's nominees, and Adams diligently signed their commissions and sent them to the Secretary of State, one John Marshall, so that the Great Seal could be affixed and the commissions could be delivered. Most of the commissions were promptly sealed and dispatched, but a few were left behind, including the commission of William Marbury, who had been nominated and confirmed as a justice of the peace for the District of Columbia.

After Thomas Jefferson was sworn in as the Nation's third President, he was furious about Adams's eleventh-hour judicial appointments,[1] and his Secretary of State, James Madison, made a fateful decision. Evaluating the facts and the law as he saw them, Madison concluded that he was under no legal obligation to deliver the commissions that had been left in Marshall's office, and he decided not to do so.

————

[1] Letter from Thomas Jefferson to Henry Knox (Mar. 27, 1801), in 33 Papers of Thomas Jefferson 465, 466 (B. Oberg ed. 2006.).

Outraged, Marbury filed suit directly in our Court, asking that Madison be ordered to deliver his commission. But we dismissed his case, holding, among other things, that it did not fall within our "appellate jurisdiction." *Marbury* v. *Madison*, 1 Cranch 137, 175–176, 180 (1803). Why? Because "appellate jurisdiction" means jurisdiction to review "the proceedings in a cause [*i.e.,* a case] already instituted" in another court. *Id*., at 175. Madison was an Executive Branch officer, not a court, and therefore Marbury's dispute with Madison did not become a "cause" or case until it was brought before this Court. As a result, review of Madison's decision did not fall within our "appellate" jurisdiction. *Id.,* at 175–176.

That conclusion was straightforward enough. But suppose that Madison's decisionmaking process had been more formal. Suppose that he had heard argument about his legal obligations—and perhaps even testimony about Marbury's qualifications. (After all, President Jefferson reappointed some of Adams's nominees, but not Marbury.[2]) Or suppose Madison had convened an Executive Branch committee to make an initial determination. Suppose that this entity was labeled the "Court of Commission Review." Suppose that the members wore robes and were called judges, held their meeting in a courthouse, and adopted court-like procedures. With all these adornments, would Madison's decision have fallen within our appellate jurisdiction? Would *Marbury* v. *Madison* have come out the other way?

The answer is no, and the reason is the same as before. Our appellate jurisdiction permits us to review one thing: the lawful exercise of *judicial* power. Lower federal courts exercise the judicial power of the United States. State courts exercise the judicial power of sovereign state gov-

——————

[2] Prakash, The Appointment and Removal of William J. Marbury and When an Office Vests, 89 Notre Dame L. Rev. 199, 209 (2013).

ernments. Even territorial courts, we have held, exercise the judicial power of the territorial governments set up by Congress. Executive Branch officers, on the other hand, cannot lawfully exercise the judicial power of *any* sovereign, no matter how court-like their decisionmaking process might appear. That means their decisions cannot be appealed directly to our Court.

We have followed this rule for more than two centuries. It squarely resolves this case. Courts-martial are older than the Republic and have always been understood to be Executive Branch entities that help the President, as Commander in Chief, to discipline the Armed Forces. As currently constituted, military tribunals do not comply with Article III, and thus they cannot exercise the Federal Government's judicial power. That fact compels us to dismiss Ortiz's petition for lack of jurisdiction.

Today's decision is unprecedented, and it flatly violates the unambiguous text of the Constitution. Although the arguments in the various opinions issued today may seem complex, the ultimate issue is really quite simple. The Court and the concurrence say that Congress may confer part of the judicial power of the United States on an entity that is indisputably part of the Executive Branch. But Article III of the Constitution vests "[t]he judicial Power of the United States"—every single drop of it—in "one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish" in compliance with that Article. A decision more contrary to the plain words of the Constitution is not easy to recall.

I

Under Article III of the Constitution, the judicial power of the United States may be vested only in tribunals whose judges have life tenure and salary protection. §1. "There is no exception to this rule in the Constitution." *Benner* v. *Porter*, 9 How. 235, 244 (1850); *Oil States Energy*

*Services, LLC* v. *Greene's Energy Group, LLC*, 584 U. S.
___, ___ (2018) (slip op., at 5–6); *Stern* v. *Marshall*, 564
U. S. 462, 503 (2011); *Martin* v. *Hunter's Lessee*, 1 Wheat.
304, 330–331 (1816) (Story, J.).

The Court of Appeals for the Armed Forces (CAAF) is
not such a tribunal.  Its judges serve 15-year terms and
can be removed by the President for cause.  10 U. S. C.
§§942(b), (c).  As the majority acknowledges, the CAAF is
an Executive Branch entity, and as such, it cannot be
vested with the judicial power conferred by Article III.
If the CAAF *were* to do something that either amounts to
or requires the exercise of judicial power, it would be
unconstitutional.

After specifying the only institutions that may exercise
the judicial power of the United States, Article III defines
the permissible scope of the jurisdiction of this Court.
Article III allows us to exercise both "original" and "appel-
late" jurisdiction.  Our original jurisdiction is limited to
"Cases affecting Ambassadors, other public Ministers and
Consuls, and those in which a State shall be Party," §2, so
it is obvious that Ortiz's case does not fall within our
original jurisdiction.  But what about our appellate juris-
diction?  If we directly reviewed a decision of the CAAF,
would that be an exercise of "appellate" review in the
sense meant by Article III?  The answer is no.

A

The understanding of appellate jurisdiction embodied in
Article III has deep roots.  Blackstone explained that a
"court of appeal" has jurisdiction only to "reverse or affirm
the judgment of the inferior *courts*."  3 W. Blackstone,
Commentaries on the Laws of England 411 (1768) (Black-
stone) (emphasis added).  Echoing Blackstone, we have
held that our appellate jurisdiction permits us to act only
as "[a] supervising Court, whose peculiar province it is to
correct the errors of an inferior Court."  *Cohens* v. *Vir-*

*ginia*, 6 Wheat. 264, 396 (1821) (Marshall, C. J.). And we have reiterated that "[a]n appellate jurisdiction necessarily implies some judicial determination, some judgment, decree, or order of an inferior tribunal, from which an appeal has been taken." *The Alicia*, 7 Wall. 571, 573 (1869); *Webster* v. *Cooper*, 10 How. 54, 55 (1850); 3 J. Story, Commentaries on the Constitution of the United States §916, p. 652 (1833) (Story).

Those principles make it easy to understand what *Marbury* meant when it held that "[i]t is the essential criterion of appellate jurisdiction, that it revises and corrects the proceedings in a cause already instituted, and does not create that cause." 1 Cranch, at 175. The cause (or case) must have been created previously, somewhere else. And as Blackstone suggested, what "creates" a "case" in the relevant sense—that is, what transforms a dispute into a "case" that an appellate court has jurisdiction to resolve— is the prior submission of the dispute to a tribunal that is lawfully vested with judicial power.

We held exactly that not long after *Marbury*, and in a decision no less seminal. A dispute "becomes a case" for purposes of Article III, we held, only when it "assume[s] such a form that *the judicial power* is *capable of acting* on it. That power is capable of acting only when the subject is *submitted to it* by a party who asserts his rights in the form prescribed by law. It *then* becomes a case." *Osborn* v. *Bank of United States*, 9 Wheat. 738, 819 (1824) (Marshall, C. J.) (emphasis added). Hence, in order to create a "case" that Article III permits us to review on appeal, a litigant must have first "submitted" the dispute to another tribunal that was "capable" of exercising the "judicial power" of the government to which the tribunal belongs. As discussed, Executive Branch tribunals cannot fill that essential role.

We reiterated this principle in *Cohens*, another foundational precedent of the Marshall Court. "To commence a

suit," Chief Justice Marshall explained, "is to demand something by the institution of process *in a Court of justice.*" 6 Wheat., at 408 (emphasis added). Courts of justice are those tribunals "erected by" the sovereign and properly vested with the sovereign's own "power of judicature." 1 Blackstone 257 (1765). When the sovereign is the Federal Government, that means only courts established under Article III, for only those courts may exercise the judicial power of the United States. See *Cohens*, *supra,* at 405; The Federalist No. 78, pp. 469–472 (C. Rossiter ed. 1961) ("the courts of justice" are those described in Article III).

This view of appellate jurisdiction explains why, in *Martin* v. *Hunter's Lessee*, Justice Story declared that "if . . . congress should not establish [inferior Article III] courts, the appellate jurisdiction of the supreme court would have nothing to act upon, unless it could act upon cases pending in the state courts." 1 Wheat., at 339–340. Without decisions of Article III courts or state courts to review, our appellate jurisdiction would have lain idle— but *not* because there were no Executive Branch tribunals, like the CAAF, deciding federal questions. To the contrary, executive agencies have "conduct[ed] adjudications"—often taking "'judicial' forms"—"since the beginning of the Republic." *Arlington* v. *FCC*, 569 U. S. 290, 304–305, n. 4 (2013); *Freytag* v. *Commissioner*, 501 U. S. 868, 910 (1991) (Scalia, J., concurring in part and concurring in judgment); see generally J. Mashaw, Creating the Administrative Constitution 34–35 (2012).

Such Executive Branch adjudications, however, do not give rise to "cases" that Article III grants us appellate jurisdiction to review, precisely because officers of the Executive Branch cannot lawfully be vested with judicial power. That is why Chief Justice Marshall declared, without qualification, that "[a] mandamus to an *officer* [of the Executive Branch] is held to be the exercise of original jurisdiction; but a mandamus to an *inferior court* of the

United States, is in the nature of appellate jurisdiction."
*Ex parte Crane*, 5 Pet. 190, 193 (1831) (emphasis added).
Time has not sown doubts about the truth of that rule.
*E.g., Verizon Md. Inc.* v. *Public Serv. Comm'n of Md.*, 535
U. S. 635, 644, n. 3 (2002) ("judicial review of executive
action, including determinations made by a state adminis-
trative agency," involves the exercise of federal court's
"original jurisdiction" rather than its "appellate jurisdic-
tion," which covers only "state-court judgments"); L. Jaffe,
Judicial Control of Administrative Action 263, n. 5 (1965).

We have taken this same approach when deciding
whether we may assert appellate jurisdiction to review the
decision of a state tribunal: We look to state law to see
whether the tribunal in question was eligible to receive
the State's judicial power. *E.g., Betts* v. *Brady*, 316 U. S.
455, 458–460 (1942); cf. *Chicago, R. I. & P. R. Co.* v. *Stude*,
346 U. S. 574, 578–579 (1954) (federal courts cannot exer-
cise removal jurisdiction—which is appellate in nature,
*Martin, supra,* at 349—while a dispute is still in state
"administrative" proceedings; removal is proper only after
"the jurisdiction of the state district court is invoked");
*Verizon Md., supra.*

## B

This understanding of appellate jurisdiction bars our
review here. The dispute between Ortiz and the Federal
Government has been presented to four tribunals: the
initial court-martial, the Air Force Court of Criminal
Appeals, the CAAF, and this Court. Each of those tribu-
nals belongs to a branch of the Federal Government. Yet
only one of them—our Court—is capable, under the Con-
stitution, of exercising the Government's judicial power.
Thus, the dispute between Ortiz and the Federal Govern-
ment did not become an Article III "case" until Ortiz peti-
tioned our Court to hear it. That means our present adju-
dication—no less than our adjudication of the dispute

between Marbury and Madison—lacks "the essential criterion of appellate jurisdiction." 1 Cranch, at 175.

The majority does not question this framework; indeed, it acknowledges that, per *Marbury*, we can assert jurisdiction here only if the dispute before us blossomed into an Article III "case" before it landed at our doorstep. *Ante,* at 6–7. Curiously, however, the majority basically proceeds as though *Marbury* were our last word on the subject. *Ante,* at 6–8. That is simply not right. As discussed, our foundational precedents expressly delineate the prerequisites to the formation of a constitutional case: The dispute must, at a minimum, have been previously presented to and decided by a tribunal lawfully vested with the judicial power of the government to which it belongs. Nothing of the sort occurred here; traversing a series of "proceedings" internal to the Executive Branch, *ante,* at 7, does not count. And while there undoubtedly are differences between this case and *Marbury*, even some that "lea[p] off the page," *ante,* at 18, those distinctions are irrelevant to our jurisdiction. The dispositive common ground is that, just as in *Marbury*, we are here asked to resolve a dispute that has been presented only to Executive Branch officers. The present dispute thus lies beyond the "peculiar province" of our appellate jurisdiction to review. *Cohens*, 6 Wheat., at 396.

## C

If there were any doubt that Article III forbids us to take appeals directly from the Executive Branch, two centuries of precedent—almost all of it overlooked by the majority—would put those doubts to rest.

### 1

First consider the history of our relationship with the Court of Claims. Congress established that court in 1855 to adjudicate claims against the United States. §1, 10

Stat. 612. Congress provided the court's judges with life tenure and salary protection, just as Article III requires. *Ibid.* The Court of Claims was a court of record, and it followed all the procedures—and possessed all the ancillary powers (subpoena, contempt, etc.)—that one would expect to find in a court of justice. §§3–7, 10 Stat. 613; §4, 12 Stat. 765–766. Its decisions had preclusive effect, and were appealable directly to our Court. §§7, 5, *id.*, at 766. If the court rendered judgment for a claimant, however, the Secretary of the Treasury could partially revise its decision by modifying the amount of the judgment to be paid (though not the court's legal conclusion that the claimant was in the right). §14, *id.*, at 768.

Under principles as old as *Hayburn's Case*, 2 Dall. 409 (1792), a court whose judgments are not self-executing no more complies with Article III than a tribunal whose judges are not life tenured. For that reason alone, we dismissed for lack of jurisdiction the first time a party appealed a Court of Claims decision directly to our Court. *Gordon* v. *United States*, 2 Wall. 561 (1865), 117 U. S. Appx. 697 (1864). It did not even matter that the court's decision in that case had been *against* the claimant, and was thus immune from revision, and would have been fully binding if we had affirmed. All that mattered was that the Court of Claims, like the CAAF, lacked an attribute that Article III makes prerequisite to the vesting of judicial power. *Id.,* at 704. In words that apply as much here, we said that "the so-called judgments of the Court of Claims . . . could not be deemed an exercise of judicial power, and could not, therefore, be revised by this court." *In re Sanborn*, 148 U. S. 222, 224 (1893). It was irrelevant how much the Court of Claims otherwise "resemble[d] . . . courts whose decisions we review." *Ante,* at 9.

The story does not end there, however. In 1866 Congress did something it has never done with respect to courts-martial: It brought the Court of Claims into com-

pliance with Article III by repealing the provision that made some of its decisions revisable by the Treasury Secretary. Ch. 19, §1, 14 Stat. 9. We began hearing appeals from it "immediately." *United States* v. *Jones*, 119 U. S. 477, 478 (1886). We now were able to "accep[t] appellate jurisdiction over what was, necessarily, an exercise of the judicial power which *alone* [we] may review." *Glidden Co.* v. *Zdanok*, 370 U. S. 530, 554 (1962) (plurality opinion) (citing *Marbury*, *supra*, at 174–175; emphasis added).

2

Next consider our practice in entertaining petitions for writs of habeas corpus.

Four years after *Marbury*, we reaffirmed its core holding in *Ex parte Bollman*, 4 Cranch 75 (1807) (Marshall, C. J.). Two men were taken into federal custody, and their confinement was approved by an Article III court. *United States* v. *Bollman*, 24 F. Cas. 1189, 1190, 1196 (No. 14,622) (CC DC 1807). They then petitioned our Court for a writ of habeas corpus. Applying *Marbury*, we held that the jurisdiction "which the court is now asked to exercise is clearly *appellate*. It is the revision of a decision of an inferior court." 4 Cranch, at 101.

Contrast *Bollman* with *Ex parte Barry*, 2 How. 65 (1844) (Story, J.), and *In re Metzger*, 5 How. 176 (1847). In *Barry*, the petitioner sought relief in this Court without first presenting his claim to an inferior federal court or a state court, and so Justice Story explained that "[t]he case, then, is one avowedly and nakedly for the exercise of original jurisdiction by this court," and was required to be dismissed. 2 How., at 65. In *Metzger*, "the district judge" had "heard and decided" the lawfulness of the petitioner's custody, but the judge had done so only "*at his chambers, and not in court*." 5 How., at 191 (emphasis added). His judgment was not provisional, like some early Court of

Claims decisions—but his status as a judge at chambers was still fatal to our jurisdiction. In a technical sense, a judge at chambers "exercises a special authority" distinct from the judicial power vested by Article III—which meant that the Constitution would permit us to review his decision in "[t]he exercise of an original jurisdiction only." *Id.,* at 191–192.

### 3

Finally, and especially pertinent here, we have adhered to the *Marbury* principle in the many instances in our Court's history in which we have been asked to review the decision of a military tribunal. First, in *Ex parte Vallandigham*, 1 Wall. 243 (1864), an Ohio resident had been tried and sentenced by a military commission, and its decision became final after being approved up the chain of command. Vallandigham sought relief directly from our Court, without first petitioning a lower federal court. We held that we lacked jurisdiction. *Id.,* at 254. The military commission, like the CAAF, was not one of the "courts of the United States" established under Article III, *id.,* at 251, and thus it could not exercise the judicial power of the Federal Government, but could exercise only "a special authority," *id.,* at 253—just like the Court of Claims, and just like a judge at chambers. Given that fact, we held it was "certain" that any review of its decisions could take place only in the exercise of our original, and not appellate, jurisdiction. *Id.,* at 251–252. And despite what the majority seems to think, see *ante,* at 17, n. 8, in *Vallandigham* we *recognized* that the military tribunal had "judicial character" in the sense that it had "the authority . . . to examine, to decide and sentence," but—in the same breath—we affirmed the crucial point, namely, that such character "'is not judicial . . . in the sense in which judicial *power* is granted to the courts of the United States.'" 1 Wall., at 253 (emphasis added).

Contrast *Vallandigham* with a pair of decisions we issued shortly thereafter. In *Ex parte Milligan*, 4 Wall. 2 (1866), and *Ex parte Yerger*, 8 Wall. 85 (1869), we again were asked to grant relief to petitioners who, just like Vallandigham (and just like Ortiz), were in custody under orders of a non-Article III military tribunal. But unlike Vallandigham and Ortiz, Milligan and Yerger first sought relief in a lower federal court. *Milligan*, *supra,* at 107–108; *Yerger*, 8 Wall., at 102–103. That fact made all the difference—again, because of the rule that we possess, "under the Constitution, an appellate jurisdiction, to be exercised only in the revision of judicial decisions." *Id.,* at 97. The decisions of non-Article III military courts do not qualify.

Similarly, after World War II we received "more than a hundred" habeas petitions from individuals in the custody of "various American or international military tribunals abroad," almost none of whom had "first sought [relief] in a lower federal court." R. Fallon, J. Manning, D. Meltzer, & D. Shapiro, Hart and Wechsler's The Federal Courts and the Federal System 292 (7th ed. 2015). Consistent with *Marbury*, we denied review in every one. Fallon, *supra,* at 292–293. Thus, while it is surely true that "not every military tribunal is alike" in all respects, *ante,* at 17, before today, they were at least alike in this respect: Their decisions could not be reviewed directly here.

## D

The unbroken line of authorities discussed above vividly illustrates the nature and limits of our appellate jurisdiction as defined in Article III. Today's decision cannot be squared with those authorities, and the majority barely even tries. The majority says not a word about the Court of Claims, even though that tribunal surely had sufficient "court-likeness," *ante,* at 16 (emphasis deleted), to come within the scope of our appellate jurisdiction under today's

test. Nor does the majority acknowledge the slew of on-point habeas decisions—save for *Vallandigham*, which it waves away by emphasizing irrelevant factual details (like the commanding officer's facial hair). Despite its running refrain that the CAAF displays a "judicial *character*," *ante,* at 6 (emphasis added); see also *ante,* at 8, 18, 19, the majority simply never comes to grips with the substance of our holdings: We may not hear an appeal directly from any tribunal that has not been lawfully vested with judicial *power*. That rule directly covers the CAAF, and it bars our review.

## II

Having said very little about a large body of controlling precedent, the majority says very much about the fact that we have long heard appeals directly from territorial courts and the courts of the District of Columbia. *Ante,* at 12–16. The majority claims to be looking for a "powerful reason" why our appellate jurisdiction should treat courts-martial any differently. *Ante,* at 15. A careful reading of our decisions shows that we have a good reason ready at hand—one that is fully consistent with *Marbury*.

The reason, as I explain below, is this: Congress enjoys a unique authority to create governments for the Territories and the District of Columbia and to confer on the various branches of those governments powers that are distinct from the legislative, executive, and judicial power of the United States. Thus, for example, the courts of the District of Columbia exercise the judicial power of the District, not that of the United States. The courts of the United States Virgin Islands exercise the judicial power of that Territory, not the judicial power of the United States. By contrast, the CAAF and other military tribunals are indisputably part of the Executive Branch of the Government of the United States. They exercise the power of the United States, not that of any other government, and since

they are part of the Executive, the only power that they
may lawfully exercise is executive, not judicial. Unless
they are removed from the Executive Branch and trans-
formed into Article III courts, they may not exercise any
part of the judicial power of the United States. Nor need
they exercise judicial power to carry out their functions, as
we have always understood.

A

We have long said that Congress's authority to govern
the Territories and the District of Columbia stems as
much from its inherent sovereign powers as it does from
specific constitutional provisions in Articles IV and I. *Sere*
v. *Pitot*, 6 Cranch 332, 336–337 (1810) (Marshall, C. J.);
*American Ins. Co.* v. *356 Bales of Cotton*, 1 Pet. 511, 546
(1828) (Marshall, C. J.); *Late Corp. of Church of Jesus
Christ of Latter-day Saints* v. *United States*, 136 U. S. 1,
42 (1890); see also Art. IV, §3, cl. 2 (Territories); Art. I, §8,
cl. 17 (District). Perhaps reflecting that view, the found-
ing generation understood—and for more than two centu-
ries, we have recognized—that Congress's power to govern
the Territories and the District is *sui generis* in one very
specific respect: When exercising it, Congress is not bound
by the Vesting Clauses of Articles I, II, and III.

The Vesting Clauses impose strict limits on the kinds of
institutions that Congress can vest with legislative, execu-
tive, and judicial power. See generally *Department of
Transportation* v. *Association of American Railroads*, 575
U. S. ___, ___–___ (2015) (THOMAS, J., concurring in judg-
ment) (slip op., at 2–3). Those limits apply when Congress
legislates in every other area, including when it regulates
the Armed Forces. See *Loving* v. *United States*, 517 U. S.
748, 767–768, 771–774 (1996) (Article I nondelegation
doctrine applies to congressional regulation of courts-
martial). But it has been our consistent view that those
same limits do not apply when Congress creates institu-

tions to govern the Territories and the District. As we said in *Benner* v. *Porter*, 9 How. 235, 242 (1850), territorial governments set up by Congress "are not organized under the Constitution, nor subject to its complex distribution of the powers of government, as the organic law; but are the creations, exclusively, of the legislative department." Congress may therefore give territorial governments "a legislative, an executive, and a judiciary, with such powers as it has been their will to assign to those departments." *Sere*, *supra,* at 337. That is why we have often repeated that "[i]n legislating for [the Territories], Congress exercises the combined powers of the general, and of a state government." *American Ins. Co.*, *supra,* at 546; *Palmore* v. *United States*, 411 U. S. 389, 403 (1973). Just as the Vesting Clauses do not constrain the States in organizing their own governments, *Dreyer* v. *Illinois*, 187 U. S. 71, 84 (1902), those Clauses do not constrain Congress in organizing territorial governments.

Thus, unlike any of its other powers, Congress's power over the Territories allows it to create governments in miniature, and to vest those governments with the legislative, executive, and judicial powers, not of the United States, but of the Territory itself. For that reason we have upheld delegations of legislative, executive, and judicial power to territorial governments despite acknowledging that each one would be incompatible with the Vesting Clauses of the Federal Constitution if those Clauses applied. See, *e.g., Dorr* v. *United States*, 195 U. S. 138, 153 (1904) (territorial legislature); *Cincinnati Soap Co.* v. *United States*, 301 U. S. 308, 322–323 (1937); *Snow* v. *United States*, 18 Wall. 317, 321–322 (1873) (territorial executive); *American Ins. Co.*, *supra* (territorial courts); *Sere*, *supra*; *Kendall* v. *United States ex rel. Stokes*, 12 Pet. 524, 619 (1838); *Keller* v. *Potomac Elec. Power Co.*, 261 U. S. 428, 442–443 (1923).

The Framers evidently shared this view. Thus, James

Madison took it for granted that Congress could create "a municipal legislature" for the District of Columbia, The Federalist No. 43, at 272–273, something that would otherwise violate the Vesting Clause of Article I, which prohibits Congress from delegating legislative powers to any other entity, *Wayman* v. *Southard*, 10 Wheat. 1, 42–43 (1825) (Marshall, C. J.). And Justice Story declared, without hesitation, that "[w]hat shall be the form of government established in the territories depends exclusively upon the discretion of congress. Having a right to erect a territorial government, they may confer on it such powers, legislative, judicial, and executive, as they may deem best." 3 Story §667, at 478.

The upshot is that it is *only* when Congress legislates for the Territories and the District that it may lawfully vest judicial power in tribunals that do not conform to Article III. And that, in turn, explains why territorial courts and those of the District—exercising the judicial power of their respective governments—may have their decisions appealed directly here. We said as much in *United States* v. *Coe*, 155 U. S. 76, 86 (1894), where we explained that *because* Congress's "power of government . . . over the Territories . . . includes the ultimate executive, legislative, and judicial power, it follows that the judicial action of all inferior courts established by Congress may, in accordance with the Constitution, be subjected to [our] appellate jurisdiction."

The rule of appellate jurisdiction we recognized in *Coe* is identical to the rule we have applied ever since *Marbury*: Our appellate jurisdiction is proper only if the underlying decision represents an exercise of judicial power lawfully vested in the tribunal below. Territorial courts and those of the District of Columbia have such power; the CAAF does not, and cannot be given it so long as it fails to comply with Article III. That is reason enough to treat these

tribunals differently.[3]

## B

The majority responds to this conclusion by suggesting, albeit without much elaboration, that just as the Constitution gives Congress the "exceptional" power to confer non-Article III judicial power on the courts of the Territories and the District of Columbia, the Constitution also gives Congress the "exceptional" power to vest military tribunals with non-Article III judicial power. See *ante,* at 15, and n. 7. But the Vesting Clauses are exclusive, which means that the Government's judicial power is not shared between Article II and Article III. See *supra,* at 3–4 (collecting cases); see also, *e.g., Arlington*, 569 U. S., at 304–305, n. 4; *Ex parte Randolph*, 20 F. Cas. 242, 254 (No. 11,558) (CC Va. 1833) (Marshall, C. J.) (those whose "offices are held at the pleasure of the president . . . are, consequently, incapable of exercising any portion of the judicial power"); *Association of American Railroads*, 575 U. S., at \_\_\_, \_\_\_ (THOMAS, J., concurring in judgment) (slip op., at 2, 9); *B&B Hardware, Inc.* v. *Hargis Industries, Inc.*, 575

—————

[3] It is true that our decisions concerning territorial governments, and territorial courts in particular, have had their share of critics. See, *e.g.,* M. Redish, Federal Jurisdiction: Tensions in the Allocation of Judicial Power 36–39 (1980); Currie, The Constitution in the Supreme Court: The Powers of the Federal Courts, 1801–1835, 49 U. Chi. L. Rev. 646, 719 (1982); C. Wright, Law of Federal Courts 41 (4th ed. 1983); Fallon, Of Legislative Courts, Administrative Agencies, and Article III, 101 Harv. L. Rev. 915, 972 (1988); Bator, The Constitution as Architecture: Legislative and Administrative Courts Under Article III, 65 Ind. L. J. 233, 240–242 (1990); G. Lawson & G. Seidman, The Constitution of Empire 149 (2004). But the theory underlying our cases was widely shared at the founding; our decisions have never seriously questioned it; and, if taken at face value, it coheres with the rest of our jurisprudence. Seeing no need to revisit these precedents, I would not disturb them. I certainly would not do what the majority has done: stretch an arguably anomalous doctrine and export it (in mutated form) to other contexts where it can only cause mischief.

U. S. ___, ___ (2015) (THOMAS, J., dissenting) (slip op., at 11). And neither the majority nor the concurrence ever explains how the Constitution's various provisions relating to the military, through their penumbras and emanations, can be said to produce a hybrid executive-judicial power that is nowhere mentioned in the Constitution's text, that is foreclosed by its structure, and that had gone almost entirely unnoticed before today.

Thus, to make the majority's argument parallel to the argument regarding the courts of the Territories and the District of Columbia, the majority would have to argue that the military, like the governments of the Territories and the District, is somehow not part of the Federal Government—"not organized under the Constitution, . . . as the organic law," *Benner*, 9 How., at 242—but is a government unto itself. To set out that argument, however, is to expose its weakness, for nothing could be more antithetical to the Constitution and to our traditional understanding of the relationship between the military and civilian authority. The military is not an entity unto itself, separate from the civilian government established by the Constitution. On the contrary, it is part of the Executive Branch of the Government of the United States, and it is under the command of the President, who is given the power of Commander in Chief and is ultimately answerable to the people.

To appreciate the constitutional status of military tribunals, it is helpful to recall their origins. Courts-martial are older than the Republic, and they have always been understood to be an arm of military command exercising executive power, as opposed to independent courts of law exercising judicial power. Blackstone declared that the court-martial system of the British Empire was based solely on "the necessity of order and discipline" in the military. 1 Blackstone 400. Indeed, Blackstone explained that courts-martial exercise a "discretionary power" to

"inflict" "punishment . . . extend[ing] to death itself," which was "to be guided by the directions of the crown," in express contrast to "the king's courts" which dispense "justice according to the laws of the land." *Id.,* at 402, 400. The crown's "extensive" power over the military— exercised, in part, through courts-martial—was "executive power." *Id.,* at 408. Many others have echoed the point. Thus, "[a]t the time of our separation [from Britain], . . . a court-martial . . . was not a judicial body. Its functions were not judicial functions. It was but an agency of the power of military command to do its bidding." Ansell, Military Justice, 5 Cornell L. Q. 1, 6 (1919).

When the United States declared its independence and prepared for war with Britain, the leaders of the new Nation were deeply impressed by the British court-martial system and sought to replicate it. John Adams, who in 1776 drafted the Continental Articles for the Government of the Army, was convinced that it would be "in vain" for the American patriots to seek "a more complete system of military discipline" than the existing British model. 3 The Works of John Adams 68 (C. Adams ed. 1851). He and Thomas Jefferson therefore proposed adopting "the British articles of war, *totidem verbis*." *Id.,* at 68–69. The Continental Congress agreed. *Id.,* at 69. And when the Constitution and the Bill of Rights were adopted, no one suggested that this required any alteration of the existing system of military justice. On the contrary, as the majority recounts, the First Congress continued the existing articles of war unchanged. *Ante,* at 10. Courts-martial fit effortlessly into the structure of government established by the Constitution. They were instruments of military command. Under the Constitution, the President, as the head of the Executive Branch, was made the Commander in Chief. Art. II, §2. So the role of the courts-martial was to assist the President in the exercise of that command authority.

The ratification of the Constitution and the Bill of Rights did naturally raise some constitutional questions. For example, founding-era courts-martial adjudicated a long list of offenses, some carrying capital punishment, including for crimes involving homicide, assault, and theft. American Articles of War of 1776, §13, in 2 W. Winthrop, Military Law and Precedents 1495–1498 (2d ed. 1896) (Winthrop); see also, *e.g.,* American Articles of War of 1806, Arts. 39, 51, 54, in *id.,* at 1514–1516. In civilian life, a person charged with similar offenses was entitled to protections, such as trial by jury, that were unavailable in courts-martial. Moreover, the Constitution entitled such persons to *judicial* process—which courts-martial, lacking the necessary structural attributes of Article III courts, could not afford. So how could they try serious crimes, including even capital offenses?

The simple answer goes back to the fundamental nature of courts-martial as instruments of command. As Blackstone recognized, the enforcement of military discipline, an essential feature of any effective fighting force, was viewed as an *executive* prerogative. It represented the exercise of the power given to the President as the head of the Executive Branch and the Commander in Chief and delegated by him to military commanders. Thus, adjudications by courts-martial are executive decisions; courts-martial are not courts; they do not wield judicial power; and their proceedings are not criminal prosecutions within the meaning of the Constitution. As we explained in *Milligan*, the need to maintain military order required those serving in the military to surrender certain rights that they enjoyed in civilian life and to submit to discipline by the military command. Although *Milligan* confirmed the general rule that "it is the birthright of every American citizen" to have the Federal Government adjudicate criminal charges against him only in an Article III court, 4 Wall., at 119, 122, we also stated that "[e]very one

connected with" "the military or naval service . . . while thus serving, surrenders his right to be tried by the civil courts," *id.,* at 123.　That is why the historical evidence strongly suggests that the provisions of the Bill of Rights were not originally understood to apply to courts-martial. See Prakash, The Sweeping Domestic War Powers of Congress, 113 Mich. L. Rev. 1337, 1346 (2015); Wiener, Courts-Martial and the Bill of Rights: The Original Practice II, 72 Harv. L. Rev. 266, 290–291, 294 (1958); see also 1 Winthrop 54, 241, 430, 605; *Milligan*, *supra,* at 137–138 (Chase, C. J., concurring in judgment).[4]

Due to reforms adopted in the recent past, it is possible today to mistake a military tribunal for a regular court and thus to forget its fundamental nature as an instrument of military discipline, but no one would have made that mistake at the time of the founding and for many years thereafter.　Notwithstanding modest reforms in 1874, a court-martial continued into the 20th century to serve "primarily as a function or instrument of the executive department to be used in maintaining discipline in the armed forces.　It was therefore not a 'court,' as that term is normally used." Schlueter, The Court-Martial: An Historical Survey, 87 Mil. L. Rev. 129, 150–153, 154–155 (1980).　Hence, Colonel Winthrop—whom we have called "the 'Blackstone of Military Law,'" *Reid* v. *Covert*, 354 U. S. 1, 19, n. 38 (1957) (plurality opinion)—echoed the original Blackstone in describing courts-martial as "simply *instrumentalities of the executive power*, provided by Congress for the President as Commander-in-chief, to aid him in properly commanding the army and navy and enforcing

---

[4] In fact, "for over half a century after the adoption of the Bill of Rights, its provisions were never invoked in a military situation save in a single instance," and in that case "the denial of its applicability to the military . . . was approved by no less an authority than the father of the Bill of Rights himself." Wiener, Courts-Martial and the Bill of Rights: The Original Practice II, 72 Harv. L. Rev. 266, 291 (1958).

discipline therein."  1 Winthrop 54.

Indeed, Brigadier General Samuel T. Ansell, who served as acting Judge Advocate General from 1917 to 1919, groused that the American system at the time of World War I was still "basically . . . the British system as it existed at the time of the separation," and described it as one "arising out of and regulated by the mere power of Military Command rather than Law."  Ansell, 5 Cornell L. Q., at 1.  Around the same time, Edmund Morgan—who would later help draft the Uniform Code of Military Justice (UCMJ)—declared it "too clear for argument that the principle at the foundation of the existing system is the supremacy of military command.  To maintain that principle, military command dominates and controls the proceeding from its initiation to the final execution of the sentence.  While the actual trial has the semblance of a judicial proceeding and is required to be conducted pursuant to the forms of law, . . . [i]n truth and in fact, . . . courts-martial are exactly what Colonel Winthrop has asserted them to be."  Morgan, The Existing Court-Martial System and the Ansell Army Articles, 29 Yale L. J. 52, 66 (1919).

For instance, until 1920 the President and commanding officers could disapprove a court-martial sentence and order that a more severe one be imposed instead, for whatever reason.  We twice upheld the constitutionality of this practice, *Swaim* v. *United States,* 165 U. S. 553, 564– 566 (1897); *Ex parte Reed*, 100 U. S. 13, 20, 23 (1879), which was widely used during World War I, see Wiener, *supra,* at 273.  Similarly, until 1920 it was permissible for the same officer to serve as both prosecutor and defense counsel in the same case.  West, A History of Command Influence on the Military Judicial System, 18 UCLA L. Rev. 1, 14 (1970).  Congress discontinued such practices by statute, but through the end of World War II, courtsmartial remained blunt instruments to enforce discipline.

Schlueter, *supra,* at 157–158; see also West, *supra,* at 8, n. 18.

It is precisely because Article II authorizes the President to discipline the military without invoking the judicial power of the United States that that the Constitution has always been understood to permit courts-martial to operate in the manner described above. Thus, in *Dynes* v. *Hoover*, 20 How. 65, 79 (1858), we said that the Constitution makes clear that the Government's power to "tr[y] and punis[h]" military offenses "is given without any connection between it and the 3d article of the Constitution defining the judicial power of the United States; indeed, that the two powers are entirely independent of each other."

Moreover, the principle that the Government need not exercise judicial power when it adjudicates military offenses accords with the historical understanding of the meaning of due process. In the 19th century, it was widely believed that the constitutional guarantee of due process imposed the rule that the Government must exercise its judicial power before depriving anyone of a core private right. See generally Nelson, Adjudication in the Political Branches, 107 Colum. L. Rev. 559, 562, 568–569, and n. 42 (2007); *e.g., Cohen* v. *Wright*, 22 Cal. 293, 318 (1863) ("The terms 'due process of law' have a distinct legal signification, clearly securing to every person . . . a judicial trial . . . before he can be deprived of life, liberty, or property"); *Murray's Lessee* v. *Hoboken Land & Improvement Co.*, 18 How. 272, 275, 280 (1856) (similar). Yet for most of our history we held that "[t]o those in the military or naval service of the United States the military law is due process." *Reaves* v. *Ainsworth*, 219 U. S. 296, 304 (1911); *United States ex rel. French* v. *Weeks*, 259 U. S. 326, 335 (1922); see also *Milligan*, 4 Wall., at 138 (Chase, C. J., concurring in judgment) ("the power of Congress, in the government of the land and naval forces and of the militia,

is not at all affected by the fifth or any other amend-
ment"); Wiener, 72 Harv. L. Rev., at 279 (in the history of
courts-martial, "of due process of law as a constitutional
concept, there is no trace"); cf. 1 Blackstone 403–404
(explaining the basic due process rights soldiers surrender
upon entering the army).

This understanding of the power wielded by military
tribunals parallels our current jurisprudence regarding
the authority of other Executive Branch entities to adjudi-
cate disputes that affect individual rights. An exercise of
judicial power may be necessary for the disposition of
private rights, including the rights at stake in a criminal
case. *B&B Hardware*, 575 U. S., at ___–___ (THOMAS, J.,
dissenting) (slip op., at 12–13); see also *Wellness Int'l
Network, Ltd.* v. *Sharif*, 575 U. S. ___, ___ (2015) (THOMAS,
J., dissenting) (slip op., at 6). But the adjudication of
public rights does not demand the exercise of judicial
power. *Id.,* at ___–___ (slip op., at 6–7). Similarly, en-
forcement of military discipline is not a function that
demands the exercise of judicial power, either. *Dynes*,
*supra*; *Murray's Lessee*, *supra,* at 284.

In short, military offenses are "exceptions" to Article III
in the same way that true public rights disputes are ex-
ceptions to Article III: the Federal Government can adju-
dicate either one without exercising its judicial power.
This means that when Congress assigns either of these
functions to an Executive Branch tribunal—whether the
Patent Trial and Appeal Board, the Court of Claims, or the
CAAF—that does not imply that the tribunal in question
is exercising judicial power. And the point holds notwith-
standing the undoubted fidelity to "the rule of law" that
such officers bring to their tasks. *Ante,* at 11, n. 5. Con-
trary to the majority's odd suggestion, acting "in strict
compliance with legal rules and principles" is not a
uniquely judicial virtue. *Ibid.* The most basic duty of the
President and his subordinates, after all, is to "take Care

that the Laws be *faithfully executed*." Art. II, §3 (emphasis added). Hence, acting with fidelity to law is something every executive officer is charged with doing, but those officers remain *executive* officers all the same. For that reason, and in light of the history recounted above, the majority's suggestion that "[t]he military justice system's essential character" is "judicial," and has been "maintained" as such since the "very first Congress," *ante,* at 8, 10, simply does not square with the actual operation of the court-martial system or the consensus view of its place in our constitutional scheme.

C

In response to this history, the majority tries to enlist Colonel Winthrop as an ally, *ante,* at 10–11, and n. 5, but Winthrop had a firmer grasp than the majority on the distinction between functions that can be described as "judicial" in a colloquial sense and functions that represent an exercise of "judicial power" in the constitutional sense. Thus, while Winthrop observed that courts-martial resemble constitutional courts in certain respects, he made those observations "*[n]otwithstanding* that the court-martial is only an instrumentality of the executive power having no relation or connection, in law, with the judicial establishments of the country." 1 Winthrop 61 (emphasis added). Nor was Winthrop the only military commentator who employed such terms casually from time to time. *E.g.,* W. De Hart, Observations on Military Law 6 (1859) (describing an officer's authority to appoint members of a court-martial as "a legislative power"); *id.,* at 14 (describing courts-martial as "being clothed with judicial powers"). Indeed, our own Court has frequently described functions as "judicial" in a colloquial sense, despite knowing they are executive in the constitutional sense. *E.g., Smelting Co.* v. *Kemp*, 104 U. S. 636, 640 (1882) (Land Department officers "exercise a judicial function" although

they are "part of the administrative and executive branch of the government"); *Murray's Lessee*, 18 How., at 280–281; *Vallandigham*, 1 Wall., at 253; *Arlington*, 569 U. S., at 304–305, n. 4.

The majority's reliance on Attorney General Bates is even weaker. *Ante,* at 10. Bates wrote a memo to President Lincoln opining that when the President acts to "approve and confirm the sentence of a court martial," or to "revis[e] its proceedings," Congress intended him to "act *judicially*—that is, [to] exercise the discretion confided to him within the limits of law." 11 Op. Atty. Gen. 20–21 (1864). Bates was arguing that a President could not revoke a court-martial sentence after it had been carried into execution. He was describing an implicit limit on the power of the President under the system of military justice established by statute. His reference to certain Presidential actions as "judicial" had nothing to do with judicial review, and in *Vallandigham*, *supra,* at 254, we rejected the idea that "the President's action" in approving a court-martial decision is an exercise of judicial power that we can review directly.

In sum, the majority has done nothing to undermine the overwhelming historical consensus that courts-martial permissibly carry out their functions by exercising executive rather than judicial power.

### III

What remains of the majority's analysis boils down to the assertion that courts-martial "resemble" conventional courts, *ante,* at 9, indeed, that "court-likeness" is the dispositive issue, *ante,* at 16 (emphasis deleted).

The first thing to be said in response to this theory is that we have "never adopted a 'looks like' test to determine if an adjudication" involves an exercise of judicial power. *Oil States*, 584 U. S., at ___ (slip op., at 15). On the contrary, we have frequently repudiated this mode of

analysis as utterly inadequate to police separation-of-powers disputes. See, *e.g., INS* v. *Chadha,* 462 U. S. 919, 953, n. 16 (1983); *Arlington, supra*; *Gordon,* 117 U. S. Appx., at 699. In fact, of all the cases on which the majority relies, not a single one suggests that our appellate jurisdiction turns on the extent to which the underlying tribunal looks like a court.

In any event, the majority's "looks like" test fails on its own terms. It is certainly true that today's military justice system provides many protections for the accused and is staffed by officers who perform their duties diligently, responsibly, and with an appropriate degree of independence. Nothing I say about the current system should be interpreted as denigrating that system or as impugning the dedication, professionalism, and integrity of the officers who serve in it, notwithstanding the majority's insistence to the contrary. *Ante,* at 11, n. 5. As explained above, military officers' undoubted fidelity to law has nothing to do with the court-martial system's status under our Constitution. That status is what my point here concerns. And that status has never changed.

Today's court-martial system was put in place in 1950, when Congress enacted the UCMJ in response to criticism following World War II. 64 Stat. 108. Among its innovations, the UCMJ subjected courts-martial to more elaborate procedural rules than ever before. It also created a system of internal appellate tribunals within the military chain of command. Those entities—which we now call the Army, Navy-Marine Corps, Air Force, and Coast Guard Courts of Criminal Appeals and the Court of Appeals for the Armed Forces—did not exist before 1950. Congress augmented this system in 1983, for the first time in American history providing for direct Supreme Court review of certain decisions of the highest military tribunal. 97 Stat. 1405–1406; 10 U. S. C. §867a; 28 U. S. C. §1259.

Such reforms, as I have indicated, are fully consistent

with the President's overriding duty to "faithfully ex-
ecut[e]" the laws. Art. II, §3. Hence, even after Congress
passed the UCMJ, we continued to recognize that the
court-martial system "has always been and continues to be
primarily an instrument of discipline," *O'Callahan* v.
*Parker*, 395 U. S. 258, 266 (1969), and that "courts-martial
are constitutional instruments to carry out congressional
and executive will," *Palmore*, 411 U. S., at 404; see also,
*e.g., Reid*, 354 U. S., at 36 (plurality opinion); *United
States ex rel. Toth* v. *Quarles*, 350 U. S. 11, 17 (1955);
*Chappell* v. *Wallace*, 462 U. S. 296, 300 (1983). For that
reason, even if the majority were to begin its analysis in
1950, and to confine it to the CAAF—which the majority
has *not* done—it would still be incorrect to perceive any-
thing other than executive power at issue here.

An examination of the CAAF confirms this point. The
CAAF's members are appointed by the President for a
term of years, and he may remove them for cause, 10
U. S. C. §§942(b), (c), under a standard we have recognized
as "very broad," *Bowsher* v. *Synar*, 478 U. S. 714, 729
(1986). These and other provisions of the UCMJ "make
clear that [the CAAF] is within the Executive Branch."
*Edmond* v. *United States*, 520 U. S. 651, 664, n. 2 (1997).
For instance, the CAAF is subject to oversight by the
Secretaries of Defense, Homeland Security, and the mili-
tary departments, and its members must meet annually to
discuss their work with members of the military and
appointees of the Secretary of Defense. 10 U. S. C. §946.
The CAAF must review any case a Judge Advocate Gen-
eral orders it to hear. §867(a)(2). And, contrary to the
majority's assertion, the CAAF's decisions are not "final
(except if we review and reverse them)." *Ante*, at 18.

In fact, in the most serious cases that the CAAF re-
views—those in which a court-martial imposes a sentence
of death or dismissal from the Armed Forces—the CAAF's
judgment cannot be executed until the President, the

relevant branch Secretary, or one of his subordinates approves it. 10 U. S. C. §§871(a), (b). That is why the UCMJ provides that "[a]fter [the CAAF] has acted on a case," the "convening authority [shall] take action in accordance with that decision," "*unless there is to be further action by the President or the Secretary concerned.*" §867(e) (emphasis added). In such cases the "proceedings, findings, and sentences" of the court-martial system— including the CAAF's "appellate review"—are not final until approved. §876.[5] Indeed, even if *our* Court affirms such a judgment, it cannot be executed until the relevant military authority approves it—a requirement that is not subject to any timeframe or substantive standards. See Manual for Courts-Martial, United States Rule for Courts-Martial 1205(b) (2016).[6]

Such revisory powers have always been a feature of the court-martial system. 1 Winthrop 683. And because the UCMJ preserves the chain of command's historic revisory power over the CAAF's most significant decisions, there is no way for us to conclude that the CAAF is "judicial" under any known definition of that term. And it should not matter that Ortiz's own sentence is not subject to

--------

[5] Thus, JUSTICE THOMAS is mistaken when he asserts that "[t]he Executive Branch has no statutory authority to review or modify the CAAF's decisions." *Ante,* at 7 (concurring opinion). And anyway, even if the CAAF's decisions were final, it would not imply that they are judicial. Insofar as the Government can adjudicate military offenses without exercising its judicial power, finality would be equally consistent with executive as well as judicial power.

[6] For example, in 1996 we granted certiorari to the CAAF and affirmed the court-martial conviction and capital sentence of Dwight Loving. *Loving* v. *United States*, 517 U. S. 748 (1996). Yet our judgment could not be deemed final—and hence could not be carried out— until the President approved it. Neither President Clinton nor President Bush would do so. *Loving* v. *United States*, 68 M. J. 1, 3 (CAAF 2009). President Obama eventually commuted the sentence to life without parole, https://www.justice.gov/pardon/obama-commutations (as last visited June 21, 2018).

approval, just as it did not matter that the Court of Claims decision at issue in *Gordon* was not subject to review by the Treasury Secretary. This point is elementary. At least since *Hayburn's Case*, 2 Dall., at 411, n., 413, n., it has been firmly established that it is "radically inconsistent" with the "judicial power" for any court's judgments, "under any circumstances," to "be liable to a reversion, or even suspension," by members of the Executive or Legislative Branches. Indeed, "[t]he award of execution is a part, and an essential part of every judgment passed by a court exercising judicial power." *Gordon*, 117 U. S. Appx., at 702; *Plaut* v. *Spendthrift Farm, Inc.*, 514 U. S. 211, 218–219 (1995).

Simply put, the CAAF's Executive Branch status is more than a label. The CAAF is what we have always thought it to be: an agent of executive power to aid the Commander in Chief. It follows that our appellate jurisdiction does not permit us to review its decisions directly. That conclusion is unaffected by Congress's decision to give greater procedural protections to members of the military. Nor would the conclusion be altered if Congress imported into the military justice system additional rights and procedures required in the civilian courts. If Congress wants us to review CAAF decisions, it can convert that tribunal into an Article III court or it can make CAAF decisions reviewable first in a lower federal court— perhaps one of the regional Courts of Appeals or the Federal Circuit—with additional review available here. But as long as the CAAF retains its current status as an Executive Branch entity, Congress cannot give our Court jurisdiction to review its decisions directly.

*       *       *

The arguments in this case might appear technical, but important interests are at stake. The division between our Court's original and appellate jurisdiction provoked

extended and impassioned debate at the time of the founding. See Amar, *Marbury*, Section 13, and the Original Jurisdiction of the Supreme Court, 56 U. Chi. L. Rev. 443, 468–478 (1989). The Framers well understood that the resolution of this dry jurisdictional issue would have practical effects, *ibid.*, and in a similar vein, the Court's holding that the CAAF exercises something akin to judicial power will have unavoidable implications for many important issues that may arise regarding the operation of the military justice system, not to mention judicial review of the many decisions handed down by administrative agencies.

The majority disclaims the latter possibility, *ante,* at 19, but its effort is halfhearted at best. In reality there is no relevant distinction, so far as our appellate jurisdiction is concerned, between the court-martial system and the "other adjudicative bodies in the Executive Branch" that the majority tells us not to worry about. *Ibid.* The majority cites the "judicial character . . . of the court-martial system," as well as its "constitutional foundations and history," *ibid.*, but as I have explained, the constitutional foundations, history, and fundamental character of military tribunals show that they are Executive Branch entities that can only permissibly exercise executive power— just like civilian administrative agencies.

The Founders erected a high wall around our original jurisdiction, deliberately confining it to two classes of cases that were unlikely to touch the lives of most people. See The Federalist No. 81, at 488. Today's decision erodes that wall. Because the Court ignores both the wisdom of the Founders, the clear, consistent teaching of our precedents, and the unambiguous text of the Constitution, I respectfully dissent.